POSNER, Circuit Judge.
 

 This antique bankruptcy case (it is more than nine years old, yet only involves the liquidation of a modest retail concern) presents an interesting question concerning the value of the debtor’s inventory on the day it made transfers to some of its creditors. Taxman Clothing Company operated a men’s clothing store in Chicago. The store closed its doors on February 21,1981, and a declaration of bankruptcy followed five days later. Early in June the trustee in bankruptcy, having removed the inventory of clothing from the store, auctioned it off, receiving $110,000 from Rothschild, the high bidder.
 

 Within the ninety days that preceded the declaration of bankruptcy — a period that began on November 29, 1980 — Taxman had transferred money to several of its creditors without receiving fresh consideration. If Taxman was insolvent throughout this period, the transfers were voidable preferences, 11 U.S.C. § 547(b)(4)(A), and the trustee is therefore entitled to recover the money received by the favored creditors, who are the defendants in this adversary proceeding. The defendants had the burden of producing evidence that Taxman was solvent on November 29. But once that burden was satisfied the trustee had to persuade the trier of fact that Taxman was insolvent on that day, §§ 547(f), (g);
 
 Clay v. Traders Bank,
 
 708 F.2d 1347, 1351 (8th Cir.1983);
 
 In re Emerald Oil Co.,
 
 695 F.2d 833, 837-38 (5th Cir.1983), with insolvency depending on the worth of the clothing inventory in Taxman’s store, reckoned at a “fair valuation,” § 101(31)(A) — whatever that means. The bankruptcy judge held that the defendants had carried their burden of production, thus shifting to the trustee the burden of persuading the judge that Taxman was insolvent at the critical time.
 

 The judge found that the value of the inventory on November 29, 1980, was $110,000. Taxman had few other assets, and liabilities in excess of $213,000, so if the $110,000 valuation is correct, Taxman was insolvent. The defendants argue that the value of the clothing was actually $215,000 — this being the “going concern” value at which Rothschild itself had appraised it — and, if they are right, Taxman was solvent on November 29 and the trustee’s suit must fail.
 

 Permut, the president of Rothschild, testified that he had conducted his appraisal in May, the month before the auction. His employees added up the prices on the price tags of all the clothing in the store, and the total was $467,000. The tag prices, however, were not transaction prices; they were just the starting point for bargaining. Permut testified that the value of the inventory was only 46 percent of the total of the tag prices, or $215,000, the other 54 percent representing the sum of the likely discounts to retail customers off the tag prices and of the retailer’s (Taxman’s) markup. Permut also testified, however, that the $110,000 which he paid for the clothing was its “fair value” and that he did not think his company “was getting a particular bargain” when it bought the inventory for that amount. The bankruptcy judge concluded that $110,000 was “the
 
 *169
 
 value the assets [could have] realized within a reasonable time” after February 26, 1981, the date of bankruptcy. The critical date, of course, was November 29, 1980. As to the value of the assets then, the bankruptcy judge observed that “the trustee has further established to this court’s satisfaction on the basis of documentary proof that no ‘radical changes’ in the assets or liabilities of Taxman Clothing occurred [between February 26 and November 29].” The district judge affirmed.
 

 We may assume that the average value of the inventory was unchanged between the date of bankruptcy on February 26 and the appraisal in May, since the inventory sat in the closed store throughout this period and there is no evidence that these were seasonal goods. By the same token we may assume that the value of the inventory was the same on the day the store closed, February 21, and on the day of the auction in June. Finally we may assume that while the inventory was almost certainly smaller on February 21 than it had been on November 29 — the store had been open for business throughout this period but had not been replenishing its inventory fully because creditors are reluctant to continue supplying goods to a company that has stopped paying its bills — it was not much smaller. The bankruptcy judge’s finding that there were no “radical changes” in the inventory between November 29 and the date of bankruptcy (February 26) appears to be a reference to the relative constancy in the size of the inventory over this period.
 

 Hence the only question is whether Per-mut’s “going concern” valuation ($215,000) is a better estimate of the value of the inventory than the price he paid at the auction in June ($110,000). The bankruptcy judge gave no reason for preferring the auction price to the appraisal. He did not say for example that a transaction price is always more accurate than an estimated price, and it would have been an exaggeration to say that. What is true is that Taxman’s store was not a going concern when the valuation was made in May 1981. By that time it had closed. But back on November 29, 1980, it was open and doing business. Granted, it was being pressed for payment by its suppliers; but it continued to sell clothing in its customary manner. How did the going-concern value of the inventory almost double in three months, when the inventory itself was shrinking because the store was selling its clothing faster than it was replenishing it?
 

 The value of the inventory did not double; the $110,000 valuation was not a going-concern valuation. But maybe going-concern value is not the relevant value. Or maybe Permut overvalued the going-concern value of the inventory. After all, he paid only $110,000 for the stuff, and he was the high bidder at an auction. If it was worth almost twice that on a going-concern basis, why didn’t some going concern buy it for a higher price than he paid?
 

 We begin by asking — what is always a useful type of question to ask in a case—
 
 why
 
 the law is interested in whether the debtor was insolvent at some point before he declared bankruptcy. The reason is that once a firm is in acute peril the temptation to try to keep afloat in the hope that its luck will change may lead it to strike a deal with its key creditors to the prejudice of its other creditors. Knowing this, the other creditors, unless protected by the voidable-preference rule, will be quick to force the firm into bankruptcy in order to crystallize their own entitlements. The rule induces creditors to be more forbearing, and by doing so makes it less likely that firms will be pushed into bankruptcy prematurely.
 
 In re Xonics Imaging Inc.,
 
 837 F.2d 763, 765 (7th Cir.1988).
 

 The point of peril is reached when the firm’s ability to continue as a going concern — a concern that can cover its costs — is in doubt because its expected costs are greater than its expected revenues. In legal and accounting terms, this means when its liabilities exceed its assets. A liability is a capitalization of expected costs, an asset a capitalization of expected revenues. Because not all expected revenues and expected costs are capitalized, a balance sheet (the schedule of assets and liabilities) does not always yield an accu
 
 *170
 
 rate picture of a firm’s condition. A firm could be solvent in balance-sheet terms yet be in danger of imminent failure. Bankruptcy law ignores these subtleties in the interest of having a clear rule: balance-sheet solvency determines whether the payments to creditors in the present case were voidable preferences. 11 U.S.C. § 101(31);
 
 Briden v. Foley,
 
 776 F.2d 379, 382 (1st Cir.1985);
 
 Ackman v. Walter E. Heller & Co.,
 
 307 F.Supp. 958, 969 (S.D.N.Y.1968).
 

 Whether Taxman was solvent on November 29, 1980, depends on four things: (1) what the clothing on hand could have been sold for; (2) the costs of selling; (3) the firm’s other assets; (4) the firm’s liabilities. If (1) minus (2), plus (3), exceeded (4), the firm was solvent. Permut’s appraisal of the clothing as worth $215,000 was an estimate not of (1) alone but of (1) minus (2), and hence of the net value of the asset, because he subtracted from the tag prices not only the discounts expected to be offered to customers but also the retailer’s markup, covering the expenses of selling the stuff. Cf.
 
 Contrail Leasing Partners, Ltd. v. Consolidated Airways, Inc.,
 
 742 F.2d 1095, 1101 (7th Cir.1984);
 
 In re Ebbler Furniture & Appliances, Inc.,
 
 804 F.2d 87, 91-93 (7th Cir.1986) (concurring opinion). Because Permut’s estimate of the net value of the inventory, when combined with the value of Taxman’s other assets, exceeded Taxman’s liabilities, Taxman was solvent on the critical date if Permut’s estimate was sound.
 

 Yet if the clothing really had a value, net of selling expenses, of $215,000 when Taxman’s store was still open, how is it that its value plunged to little more than half that amount as soon as it closed? For one thing, it was the liquidators hired to auction off the inventory who invited Per-mut to bid $110,000, and they may have under-estimated its value. More important, when the store was open there was a sales force to sell the clothing and a corps of customers accustomed to shop there. After the store was closed (for good) there was no obvious route for getting the clothing to the retail customer. Whoever bought the clothing at the auction would find himself with a large quantity of men’s clothes, would have to find retail outlets through which to sell them to the consumer, would have to incur the expense of transporting the clothes to those outlets, and would have other expenses as well. The difference between $110,000 and $215,-000 could just be the auction buyer’s fair markup, comparable to the markup that the retailer charges the retail customer to cover the costs of selling at retail.
 

 The trustee had the burden of persuasion, as we have said; yet the only evidence of going-concern value was the one based on Permut’s appraisal, which, if accepted, required judgment for the defendants. No reason has been offered why going-concern value is not the correct value in a case such as this, and for the reasons explained we hold that it is.
 
 In re Art Shirt Ltd.,
 
 93 B.R. 333, 341 (E.D.Pa.1988);
 
 In re Arrowhead Gardens, Inc.,
 
 32 B.R. 296, 299 (Bankr.D.Mass.1983);
 
 In re Utility Stationery Stores, Inc.,
 
 12 B.R. 170, 176 (Bankr.N.D.Ill.1981); 2 Collier on Bankruptcy ¶ 101.31[5], at pp. 101-93 to 101-94 (King 15th ed. 1989).
 

 We grant that going-concern value is not the proper standard if the business is “on its deathbed.”
 
 In re Utility Stationery Stores, Inc., supra,
 
 12 B.R. at 176. But the question is whether Taxman
 
 was
 
 on its deathbed on November 29, 1980, and the evidence is that it was not, because the assets that it could realize on in the ordinary course of its business exceeded the expenses of realizing on them, plus its (other) liabilities. The deathbed, and death, came later. “[CJaution should be taken not to consider property as ‘dead’ merely because hindsight teaches that the debtor was traveling on the road to financial ruin.” 2 Collier on Bankruptcy,
 
 supra,
 
 ¶ 101.31[5], at p. 101-94.
 

 We have treated the preferences as if all had been made on November 29. In fact they were made between that date and the date on which Taxman filed for bankruptcy, and it is of course possible that even if Taxman was still solvent on November 29 it became insolvent before some or all of the preferences were actually made. But
 
 *171
 
 the parties tried the case on the simplifying assumption that Taxman was either solvent throughout the preference period or insolvent throughout it.
 

 The remaining question, one that tends to get rather short shrift in appellate decision-making, is the precise disposition of the appeal now that we have ruled that the decision in favor of the trustee cannot stand. There are three possibilities: remand the case for further findings; remand it for a new trial; enter judgment for the defendants. The first course would be proper if under the correct legal standard (which we have held is “going-concern value”) the evidence at trial would have supported a judgment for either side; the task of applying the legal standard to the evidence is a task for the trier of fact to perform unless there can be no doubt of the outcome.
 
 Mucha v. King,
 
 792 F.2d 602, 604-06 (7th Cir.1986). That course would not be appropriate here, because the evidence presented at trial would not have supported a judgment for either side. The only evidence of going-concern value in the record is Permut’s estimate of $215,000. The second course, remanding for a new trial, would be proper if there were insufficient evidence at the original trial to decide who should prevail under the correct legal standard, and if the insufficiency could not be laid at the door of the party having the burden of proof. In a case in which the state of the record precludes a just decision, the record should be reopened and additional evidence taken.
 
 Allen v. Seidman,
 
 881 F.2d 375, 381 (7th Cir.1989). This is not such a case either, because adequate evidence of going-concern value, in the form of Permut’s appraisal,
 
 was
 
 introduced, as we have just seen.
 

 This is a case of the third kind. The evidence that the going-concern value of Taxman’s inventory on the date in question was $215,000, and therefore that Taxman was solvent then, stands uncontradicted, since the auction price of $110,000 was not inconsistent with the inventory’s having had a much higher going-concern value at the onset of the preference period. In a case in which “the record permits only one resolution of the factual issue,” the appellate court can and should resolve the issue without a remand.
 
 Pullman-Standard v. Swint,
 
 456 U.S. 273, 292, 102 S.Ct. 1781, 1792, 72 L.Ed.2d 66 (1982);
 
 Lee v. National Can Corp.,
 
 699 F.2d 932, 938 (7th Cir.1983);
 
 Doe v. United States,
 
 718 F.2d 1039, 1044 (11th Cir.1983). The judgment for the trustee is therefore reversed with instructions to enter judgment for the defendants.
 

 Reversed.