# In re BRENTWOOD LEXFORD PARTNERS, LLC, Debtor.

### Daniel J. Sherman, Chapter 7 Trustee, Plaintiff,

### v.

### FSC Realty LLC, Ralph Edward Williams, et al., Defendants.

### Bankruptcy No. 01–37645–SAF–7. Adversary No. 01–3645.

United States Bankruptcy Court, N.D. Texas, Dallas Division.

Feb. 12, 2003.

---

Steven A. Harr, Munsch Hardt et al., Dallas, TX, for Daniel J. Sherman, Chapter 7 Trustee, Plaintiff.

Eric D. Pearson, Sayles, Lidji & Werbner, Dallas, TX, for Defendants.

### MEMORANDUM OPINION AND ORDER

STEVEN A. FELSENTHAL, Bankruptcy Judge.

In this adversary proceeding, Daniel J. Sherman, the Chapter 7 trustee of the

bankruptcy estate of Brentford–Lexford Partners, LLC (BLP), the debtor, seeks to recover transfers of $627,000 and other damages from FSC Realty, LLC, Stanley Fimberg, Ralph Williams, the Williams Family Trust, Bruce Woodward, Ron Barnett, Cindy Wolfe and Myan Management Group, LLC, the defendants. Sherman alleges claims of fraudulent transfers under 11 U.S.C. § 548 and Tex. Bus. & Com. Code § 24.001 et seq, breach of fiduciary duty, breach of contract and conspiracy. In addition, he seeks to recover his attorney's fees and exemplary damages. On the eve of trial, Sherman settled his claims with FSC Realty and Fimberg. The court conducted a trial with the remaining parties from December 16, 2002, through December 18, 2002.

A proceeding to determine, avoid or recover fraudulent conveyances constitutes a core matter over which this court has jurisdiction to enter a final judgment. 28 U.S.C. §§ 157(b)(2)(H) and 1334 (2002). The trustee's other claims constitute non-core matters, but the parties have consented to the entry of a final judgment by the bankruptcy court. 28 U.S.C. § 157(c)(2)(2002). The court entered a pretrial order on August 22, 2002. This memorandum opinion contains the court's findings of fact and conclusions of law. Bankruptcy Rule 7052.

## Factual Background

Prior to 1996, Woodward, Williams and Fimberg, among others, owned Lexford Properties, Inc., a residential multi-family property management business. In 1996 they sold the business to Cardinal Realty Services, Inc. In 1997 Cardinal changed its name to Lexford, Inc., and ultimately converted itself into a real estate investment trust (REIT). As part of the conversion, Lexford sold its property management business to the debtor, BLP. Lexford subsequently merged with Equity Residential Properties, Inc. The court refers to Lexford in this memorandum opinion as Equity.

To convert its corporate tax structure to the REIT status, investment bankers and tax advisors recommended that Equity sell the third party property management business that it had acquired from, among others, Woodward, Williams and Fimberg. Equity approached Woodward, Williams and Fimberg about selling the property management business back to them. They eventually negotiated a structure under which BLP, owned by Woodward, Williams Family Trust, FSC Realty, Barnett and Wolfe, would purchase the business for $1,833,333, financed by a promissory note to Equity. Effective April 1, 1998, BLP, Williams, Fimberg, Woodward and FSC Realty entered into a stock purchase agreement with Equity for the acquisition of the third party property management business. On April 1, 1998, BLP executed the promissory note.

Woodward owned 22.5% of BLP; Williams Family Trust 22.5%; FSC Realty 45%, Barnett 5% and Wolfe 5%. Woodward served BLP as its president. Williams served BLP as its chief financial officer. Barnett served BLP as comptroller and as treasurer. He was a member of the board of directors. Wolfe held the title of vice president of operations but she was not an officer of BLP.

The note required an interest only payment on April 1, 1999. BLP timely made that payment.

The note required a payment of $313,000 for principal and interest on April 1, 2000. BLP did not make that payment. In January 2000 Fimberg requested that Equity restructure the note, reducing the principal by 90%. BLP and its principals believed that the property management business was not worth the purchase price represented by the principal of the note.

Equity disagreed and declined to restructure the note.

Within a few days of the missed April 1, 2000, payment, Leslie Fox, Equity's chief operating officer, called Fimberg. Fimberg confirmed that the note payment had not been made and would not be made. On April 11, 2000, Equity accelerated the principal due on the note. BLP made no further payment on the note. On May 1, 2000, Equity filed a complaint to collect the note.

The note provided a formula by which excess cash flow from income generated by the property management business could be paid to BLP's members. Excess cash flow would be distributed to BLP's members based on their ownership percentage. The note prohibited the distribution of excess cash flow if a delinquency existed under the note. BLP made an excess cash distribution in March 1999 based on 1998 cash flow. BLP made an excess cash distribution of $547,000 in March 2000 based on 1999 cash flow. BLP made an additional distribution of $80,000 to cover tax obligations of its members. At the time of those distributions, there was no delinquency under the note. Neither BLP nor its members informed Equity that it made the March 2000 distribution. BLP did not make the note payment due April 1, 2000.

The note required that BLP provide Equity with financial data. BLP did not provide Equity with the 1999 financial data until September 14, 2000.

On September 27, 2000, Williams resigned as chief financial officer of BLP. On September 28, 2000, Woodward resigned as chief executive officer. On September 28, 2000, Williams and Woodward formed Myan Management Group, LLC. Williams as managing member held a 50% share of Myan; Woodward held the other 50%. Myan performed property management services. Williams and Woodward caused certain property management business to be transferred from BLP to Myan. Barnett assumed the treasurer position at Myan. Wolfe went to work for Myan for a couple of months, leaving in December 2000. Neither Barnett nor Wolfe had an equity interest in Myan.

Williams, Woodward, Barnett and Wolfe did not have non-competition agreements or non-solicitation agreements with BLP or Equity. The stock purchase agreement required that FSC Realty, Fimberg, Williams and Woodward use their best efforts so long as amounts remain unpaid under the note to cause entities owning residential real property that they controlled to enter management contracts with BLP. However, the stock purchase agreement further provided that the commitment to enter management agreements was subject to the exercise of their fiduciary duties to other interest holders in the real property they controlled. With the demise of BLP following the deterioration of their relationship with Equity, Williams and Woodward relied on the lack of non-competition and non-solicitation restrictions and on the fiduciary duty provision to move property management contracts to Myan. Woodward and Williams solicited Fimberg to transfer his properties to Myan. He declined, but instead moved his properties to another management company. FSC Realty resigned as the managing member of BLP effective October 4, 2000. Fimberg was never an officer, director or employee of BLP.

On September 27, 2000, Barnett, as treasurer of BLP, caused BLP to transfer $75,000 to the law firm of Snell, Brennian and Trent. On October 20, 2000, after he had resigned from his position with BLP, Barnett caused BLP to transfer $75,000 to the law firm of Sayles Lidji and Werbner, P.C. In October 2000 Barnett transferred BLP funds to Myan for accounting ser-

vices for BLP's customers for September 2000.

On October 31, 2000, BLP ceased its business operations. On September 13, 2001, BLP filed its petition for relief under Chapter 7 of the Bankruptcy Code.

### Fraudulent Transfers

Sherman seeks to recover as fraudulent transfers the $627,000 transferred in March 2000, the transfers to the law firms, the transfer to Myan and the value of the business transferred to Myan. Sherman invokes 11 U.S.C. §§ 548 and 550 and Tex. Bus. & Com.Code §§ 24.005 and 24.006, made applicable by 11 U.S.C. § 544(b). Sherman alleges that the transfers had been made with the intent to hinder, delay or defraud BLP's creditors or had been made for less than reasonably equivalent value when BLP had been or became insolvent.

### Intent to Hinder, Delay or Defraud

Section 548(a)(1)(A) provides:

(a)(1) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted.

11 U.S.C. § 548(a)(1)(A)(2002).

Section 24.005(a)(1) of the Texas Business and Commerce Code provides:

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made or obli-

gation was incurred, if the debtor made the transfer or incurred the obligation:

(1) with actual intent to hinder, delay, or defraud any creditor of the debtor.

Tex. Bus. & Com.Code § 24.005(a)(1)(Vernon 2002).

Whereas § 548 limits the trustee to avoid transfers made within one year of the filing of the bankruptcy petition, the trustee's invocation of Texas law allows the trustee to avoid transfers made four years prior to the filing of the petition. Tex. Bus. & Com.Code §§ 24.005, 24.006(a) and 24.010(2)(Vernon 2002); *In re Erstmark Capital Corp.*, No. 98–30858–HCA–11, Adv. No. 00–3803, Civ. A. 3:01–CV–252, 2002 WL 1792213, at *2 (N.D.Tex. Aug.2, 2002).

■ The trustee may avoid any transfer of an interest of the debtor in property that is avoidable under applicable law by a creditor holding an allowed unsecured claim. 11 U.S.C. § 544(b)(2002). Known as the strong arm provision of the Bankruptcy Code, § 544 "allows the trustee to step into the shoes of a creditor for the purpose of asserting causes of action under state fraudulent conveyance laws and confers on the trustee the status of a hypothetical creditor or bona fide purchaser as of the commencement of the case." *In re Zedda*, 103 F.3d 1195, 1201 (5th Cir.1997). Equity holds an allowed unsecured claim. Equity had been BLP's primary creditor at the time of the transfers at issue. *United States v. Chapman*, 756 F.2d 1237, 1240 (5th Cir.1985) (explaining that Texas statutes governing fraudulent transfers afford no remedy to a person who was not a creditor of the transferor at the time of the transaction). Therefore, the trustee has standing to prosecute the avoidance claims.

■ Under both the Bankruptcy Code and Texas law, the intent to hinder or

delay or defraud are three separate elements. Each one on its own may make a transfer fraudulent. "Thus, an intent merely to delay, but not ultimately prevent, a creditor from being repaid is generally sufficient to trigger the requisite culpability required by the statute." 5 Collier on Bankruptcy ¶ 548.04[1], pp. 548–22 to 548–24 (rev. 15th ed.2000) (citing *Shapiro v. Wilgus,* 287 U.S. 348, 53 S.Ct. 142, 77 L.Ed. 355 (1932) (debtor's transfer of all assets to newly formed corporation after creditor threatened to sue, in effort to obtain additional time to repay all creditors was part of scheme to hinder or delay creditors)).

■ Intent to hinder, delay or defraud may be established by circumstantial evidence. *In re Reed,* 700 F.2d 986, 991 (5th Cir.1983); *In re Perez,* 954 F.2d 1026 (5th Cir.1992) (affirmed Bankruptcy Court's finding based on circumstantial evidence that property was transferred "with the intent to, if not defraud [debtor's] creditors, at least hinder or delay their discovery of and access to certain assets"). In assessing that evidence, the courts consider "badges of fraud." Section 24.005(b) of Tex. Bus. & Com.Code, the Texas Uniform Fraudulent Transfer Act ("UFTA"), codified eleven, non-exclusive, badges of fraud that may be used to prove the fraudulent intent of the transferor. *In re Hinsley,* 201 F.3d 638, 643 (5th Cir.2000). Section 24.005(b) provides:

> (b) In determining actual intent under Subsection (a)(1) of this section, consideration may be given, among other factors, to whether:
>
> > (1) the transfer or obligation was to an insider;
> >
> > (2) the debtor retained possession or control of the property transferred after the transfer;
> >
> > (3) the transfer or obligation was concealed;
> >
> > (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
> >
> > (5) the transfer was of substantially all the debtor's assets;
> >
> > (6) the debtor absconded;
> >
> > (7) the debtor removed or concealed assets;
> >
> > (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
> >
> > (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
> >
> > (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and
> >
> > (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Tex. Bus. & Com.Code § 24.005(b)(Vernon 2002).

BLP filed its bankruptcy petition on September 13, 2001. The trustee may not avoid the March 2000 transfers under § 548, but may avoid the September and October 2000 transfers under § 548. All the subject transfers may be avoided by the trustee under Texas law.

### March 2000 Transfers

■ Under the note, BLP could make distributions from its excess cash flow provided there was no delinquency in note payments. BLP generated excess cash flow of $547,000 from its 1999 operations. BLP completed its financial records for 1999 in March 2000. BLP also had $80,000 to distribute to its members for their tax obligations from BLP operations. BLP had timely made its note payment on

April 1, 1999. BLP's next note payment of $313,000 was due on April 1, 2000.

Thus, in March 2000, Williams and Woodward knew that BLP had generated excess cash flow in 1999 that would be subject to distribution to BLP's members and they knew that a note payment was due on April 1, 2000. They also knew that if BLP distributed $627,000 in March 2000, BLP would have insufficient cash in the bank on April 1, 2000, to make the $313,000 note payment.

Williams, Woodward and Fimberg all testified that by January 2000 they had concluded that the value of BLP's business did not support the principal amount of the note, namely, $1,833,333. Fimberg requested that Equity reduce the principal by 90%. Thus, in effect, Williams, Woodward and Fimberg believed that BLP's assets were worth less than $200,000 in early 2000. Equity disagreed and refused to restructure the note.

BLP also had a dispute with Equity concerning reimbursement for certain human resource expenses of $135,000. Equity had declined to reimburse or credit that amount to BLP.

Consequently, when deciding to make the March 2000 distribution, Williams and Woodward knew that a note payment would be due within days of the distribution, that BLP would have insufficient cash in its bank account to make the note payment if it made the March distribution and that the value of BLP's business, in their assessment, was substantially less than the debt on the note. Knowing that, they decided to make the distribution anyway. Woodward testified that the BLP board of directors made the decision to distribute the $627,000 and not make the note payment. Woodward, Williams and Barnett were members of the board.

BLP's officers and board members did not tell Equity that they were making the distribution. They had not yet provided Equity with BLP's financial data for 1999, when they made the distribution. They did not tell Equity that BLP would not make the April 1, 2000, note payment. They had not yet provided Equity with BLP's financial data for 1999 when the note payment was due.

Both Woodward and Williams testified that they intended thereby to force Equity to renegotiate the note. By making the excess cash distribution in March 2000 and then not making the April 1, 2000, note payment, Woodward and Williams believed they could leverage Equity into negotiations. Fimberg testified that he, Woodward and Williams discussed not making the note payment. They believed that BLP could not make the note payment and continue operating. While making the distributions, they decided not to make the note payment. They would see how Equity would respond. They felt that in negotiations they could convince Equity that the note had to be restructured because of the value of the property management business.

Brad Van Auken, Equity's general counsel, testified that Equity did not know that BLP made the $627,000 transfer.

Intent to hinder or delay Equity may be inferred from all the circumstantial evidence. The court infers that BLP, acting through its officers Woodward and Williams, intended to hinder and delay Equity's collection on the note to thereby force Equity to enter negotiations to restructure the note. By doing so, BLP made a fraudulent transfer of $627,000 in March 2000.

■ The defendants argue that BLP had sufficient assets to make the note payment on April 1, 2000, thereby negating an intent to hinder or delay. After the March

2000 distributions, BLP had $275,000 cash, an obviously insufficient amount to make the April 1, 2000, note payment of $313,000. As part of its property management operations, BLP controlled certain clients' bank accounts. Those clients owed BLP $197,000. In addition, other clients owed BLP $72,755. BLP also claimed an offset for the human resource dispute of $135,000. The defendants argue that BLP could have drawn on those assets to make the note payment. But BLP did not do so. BLP intentionally chose not to liquidate other assets to add to the cash on hand on April 1, 2000, to make the note payment. As Woodward and Williams testified, BLP intentionally chose not to make the note payment to leverage negotiations with Equity. Fimberg confirmed this strategy. To determine intent, the court looks to the totality of the circumstances. The decision to make the March 2000 distribution cannot be viewed in isolation from the leverage strategy concerning the note payment less than two weeks after the distribution. The note was due 10 days after the $627,000 distribution had been made.

The circumstances would have been different had Woodward and Williams not concealed the transfer from Equity and had they disclosed that BLP would not be making the note payment.

Wolfe played no part in the decision to make the $627,000 transfer or to not make the note payment.

The defendants also argue that $80,000 of the distribution had been made to reimburse the members for their tax obligations resulting from BLP's operations. The argument concedes the point. BLP transferred its assets to pay its members' tax obligations, not its tax obligations. Had BLP proceeded to make the April 1, 2000, note payment there would be no issue. But BLP made the transfer knowing it would lack the cash to make the

April 1, 2000, note payment and knowing that it intended not to make the payment to leverage negotiations with Equity.

The issue is not whether BLP had the assets to liquidate to make the note payment but whether BLP made the March 2000 distribution with the intent to hinder or delay Equity's collection on the note. BLP made the transfers to its equity members. § 24.005(b)(1). BLP did not inform Equity that it was making the transfers, even though BLP had not yet provided Equity with the 1999 financial data and even though BLP had suggested to Equity that its business was worth substantially less than the debt on the note. § 24.005(b)(3) and (9). BLP made the transfer to its members with the knowledge and intent not to make the note payment to thereby leverage Equity into negotiations to restructure the note. That amounts to an intent to hinder and delay.

The court therefore concludes that the trustee shall have a judgment under § 544(b) avoiding the March 2000 transfers pursuant to § 24.005(a)(1).

### Other Transfers

In October 2000 BLP remained obligated to perform accounting services for properties managed by BLP through September. By October BLP had no employees. Barnett had resigned, yet he still transferred BLP funds to Myan to perform the September accounting work. The transfer of funds to accomplish contractual obligations of BLP does not constitute a transfer made with the intent to hinder or delay creditors. The transfer enabled Myan to satisfy the contractual obligations of BLP, eliminating claims against BLP.

On September 27, 2000, Barnett transferred BLP funds to the trust account of the Snell, Brannian and Trent law firm. After he resigned from BLP, in

October 2000, Barnett caused BLP to transfer funds to Sayles Lidji and Werbner, P.C.

By order dated December 15, 2000, the state court appointed Michael Quilling as receiver for BLP. The state court charged Quilling to take possession and control over BLP's assets, including the retainers paid to the two law firms. The state court authorized Sayles to deduct fees and expenses from the retainer for services rendered on behalf of BLP, but not for services rendered for Williams or Woodward. The court ordered Sayles to provide Quilling with billing records. The court directed that Snell not withdraw funds from its retainer. By order dated April 9, 2001, the state court directed Quilling to pay Sayles for services rendered on behalf of BLP. The court provided for judicial review of the payments upon motion by Equity or BLP. Neither Equity nor BLP requested review. Quilling filed a report on December 19, 2001, stating that the Snell trust account held approximately $55,000 and the Sayles account, $31,543, after payment of fees of approximately $13,406.

The transfers to the law firms do not constitute transfers made with the intent to hinder or delay creditors. The transfers paid for services rendered to BLP. The payment of fees and the handling of retainers had been supervised by the state court. Neither Equity nor BLP disagreed with the receiver's decision to pay fees to Sayles for representing BLP. Funds not withdrawn from the retainers became property of the bankruptcy estate.

■ The trustee also contends that Williams and Woodward effectively transferred the business of BLP to Myan. Myan did not obtain property management contracts for properties controlled by Fimberg. The property management contracts could be cancelled on 30 days notice

without cause. Williams and Woodward gave that notice for contracts they controlled. Woodward prepared notices for cancellation of other contracts. Scott McGwire, a real estate investor, testified that practice was common in the business. Williams and Woodward took no actions to terminate contracts until five months after they had been sued by Equity. Williams and Woodward were not bound by non-competition or by non-solicitation agreements. Williams and Woodward were not bound by employment contracts with BLP and had the right to resign. They did so in late September. BLP was left without a Texas real estate license. BLP's business was thus effectively over by the end of September. At that point, the cancellation of property management contracts with BLP and the formation of Myan does not amount to a transfer with intent to hinder or delay creditors.

### Constructive Fraud

■ Section 548(a)(1)(B) of the Bankruptcy Code provides:

(a)(1) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debt-

or was an unreasonably small capital; or

(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

11 U.S.C. § 548(a)(1)(B)(2002). According to this provision, the court must determine from the perspective of the transferor, that no great disparity exists between the value of goods exchanged. *In re Hannover Corp.*, 310 F.3d 796, 802 (5th Cir.2002).

Section 24.006 of the Texas Business and Commerce Code provides:

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

(b) A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.

Tex. Bus. & Com.Code Ann. § 24.006 (Vernon 2002).

Because of the date of the transfers, the March 2000 transfers may not be avoided under § 548. But the transfers may be avoided under the Texas law. The other transfers may be avoided under either law. The court first considers the issue of reasonably equivalent value and then considers the insolvency issue.

**Reasonably Equivalent Value**

 Williams, Woodward, Barnett and Wolfe all testified that the excess cash distribution constituted part of their compensation for services rendered to BLP. The note provided for maximum salary for Williams, Woodward and Fimberg of $250,000. They took $90,000 less than the note provided. Woodward testified that they would look to the excess cash flow for compensation. Williams testified that with his share of the excess cash flow he obtained about the same income from the property management business that he made before BLP's creation. Wolfe testified that she viewed her share of the distribution as the equivalent of the bonus she had made before BLP's formation. Barnett also testified that he viewed the excess cash flow distribution as a bonus.

But none of them had an employment contract with BLP providing that the excess cash flow distribution would be part of their salary or a bonus as part of their compensation. Barnett testified that BLP did not accrue the excess cash flow as a compensation expense. BLP did not withhold funds from the distributions for income tax purposes. Woodward testified that there was no corporate resolution treating the excess cash flow as salary or bonus. None of the individual defendants had contracts calling for bonus payments. Van Auken testified that Equity did not consider the excess cash flow distributions as compensation. Equity considered the distribution as profits or dividends for the members of BLP. The court finds that the distributions were made to the equity holders of BLP on account of their equity interest and not to the individuals on account of services rendered. The distributions amounted to dividends. As a result, BLP did not receive reasonably equivalent value for the distributions.

■ With regard to the October 2000 transfer to Myan for accounting services, Myan performed accounting services for BLP for September. BLP had a contractual obligation to the property owners to perform the accounting services. Satisfaction of an antecedent debt of BLP constitutes value in exchange for the transfer. 11 U.S.C. § 548(d)(2)(A)(2002). With regard to the transfers to the law firms, as found above, the funds were used to pay for services rendered to BLP or remained in the trust accounts, becoming property of the bankruptcy estate. The transfers were therefore made for reasonably equivalent value. With regard to the cancellation of property management contracts and the subsequent formation of Myan, the court finds that BLP received the 30 day notice required by the contracts, with payment of the property management fees for that period. BLP therefore received reasonably equivalent value; namely, the amount provided in the contracts.

### Insolvency

■ Texas law parallels the Bankruptcy Code's approach to insolvency. Tex. Bus. & Com.Code Ann. § 24.003 (Vernon 2002). The Code defines insolvency as a "financial condition such that the sum of [the] entity's debts is greater than all of [its] property, at a fair valuation ..." 11 U.S.C. § 101(32)(2002). Courts refer to this test as a balance sheet test, and engage in the "fair valuation" of the debts and property shown on the debtor's balance sheet. *In re Lamar Haddox Contractor, Inc.*, 40 F.3d 118, 121 (5th Cir. 1994); *In re Taxman Clothing Co., Inc.*, 905 F.2d 166, 169–70 (7th Cir.1990). However, a fair valuation may not be equivalent to the book values assigned on a balance sheet. *Haddox*, 40 F.3d at 121.

■ To perform this test, the court makes a two-step analysis. *In re DAK*

*Indus. Inc.*, 170 F.3d 1197, 1199–1200 (9th Cir.1999); *Taxman*, 905 F.2d at 169–70. The court must first determine whether the debtor was a "going concern" or was "on its deathbed." The court must then value the debtor's assets, depending on the status determined in the first inquiry, and apply the balance sheet test to determine whether the debtor was solvent. *Id.*

For a debtor that was a going concern, the court would "determine the fair market price of the debtor's assets as if they had been sold as a unit, in a prudent manner, and within a reasonable time." *Id.* As a going concern, the debtor would not likely face a forced sale. Accordingly, a fair market valuation best determines a fair market price.

■ The Fifth Circuit has instructed that the fair value of property is determined "... by 'estimating what the debtor's assets would realize if sold in a prudent manner in current market conditions.'" *Haddox*, 40 F.3d at 121 (quoting *Pembroke Dev. Corp. v. Commonwealth Sav. & Loan Ass'n*, 124 B.R. 398, 402 (Bankr.S.D.Fla.1991)). The assets may be valued if sold individually or if packaged in groups based on business considerations. *Cf. In re Consol. Capital Equities Corp.*, 157 B.R. 280, 284 (Bankr.N.D.Tex.1993)(valuing assets for solvency determination under state fraudulent conveyance law).

Accordingly, even if the willing seller, willing buyer methodology is not the per se test for a going concern valuation, the court must apply a market analysis. The court must determine the value of a going concern's property based on the current market, involving a prudent sale within a reasonable time, whether the sale be on an asset or business unit basis. The determination requires a market analysis.

In March 2000 BLP was a going concern. BLP managed approximately 50 multi-family residential real estate properties, collecting fees for its management services. Accordingly, the court must determine the fair value of its assets, whether sold as a whole or by business units, i.e., the management contracts.

Jeff Balcombe, a certified public accountant, testified on behalf of the trustee. He opined that BLP was insolvent by using an asset-based approach. He examined BLP's 1999 year-end balance sheet, rolling forward through the first quarter of 2000. He testified that as of March 30, 2000, BLP's debts exceeded the sum of its assets. He further testified that with the acceleration of the note on April 13, 2000, BLP could not pay its debts as they became due. David T. Roberts testified on behalf of the defendants. He criticized certain assumptions made by Balcombe, especially those concerning good will, amortization of assets and BLP's computer program licenses.

 But, most significantly, Balcombe did not evaluate the BLP assets based on market conditions. He presented no evidence regarding what a willing buyer would pay BLP, assuming it was a willing seller, for its business as a whole or by units. Balcombe did testify that he used the note amount as a proxy for the market value. However, Van Auken, Williams, Woodward and Fimberg all testified that the 1998 transaction had been designed to effectuate the conversion of Equity's business structure to a REIT with a related secondary equity offering. Williams, Woodward and Fimberg all had relationships with Equity. All held ownership positions with Equity. Fimberg sat on Equity's board of directors. All had an incentive to structure the property management transaction to further the REIT transaction, regardless of the debt or structure of

BLP. Williams, Woodward and Fimberg negotiated the terms of the BLP to assure that Equity would not have recourse against them, and that they would not be subject to non-competition and non-solicitation restrictions. As Williams testified, because of the REIT and secondary offering prospect and because of the structure of the note, BLP was worth a "crap shoot." The Equity/BLP transaction was not a willing buyer, willing seller transaction. It was more in the nature of an insider transaction designed to further other business objectives. The amount of the note in 1998 therefore does not inform the fair value of BLP's assets in March 2000.

Nevertheless, the court may consider all the evidence presented at trial. By January 2000 Williams, Woodward and Fimberg concluded that BLP's property management business was not worth the principal due on the note. On January 17, 2000, Fimberg wrote a letter to Douglas Crocker, Equity's president and chief executive officer, requesting that the note be restructured by April 1, 2000. Fimberg stated that BLP could not service the note without additional business provided by Equity. As Van Auken testified, Equity owned and managed 36,000 apartment units. BLP's members anticipated that Equity would provide BLP with management business from these units. Equity did not do so. Fimberg also provided Crocker with financial information for BLP. Crocker, however, disagreed with BLP. On January 14, 2000, Crocker responded by letter to Fimberg, stating that BLP's business was worth more than the principal amount of the note.

BLP's business derived from the management of property owned by third persons. In the residential multi-family real estate industry, property management contracts usually follow the principals of the owners or managing partners of the

real estate. Fox confirmed this practice. As McGwire testified, the contracts typically could be cancelled on 30 days notice without cause and without penalty. McGwire testified that property management contracts changed fairly frequently for various reasons. He also testified that it was common for management to be based on personal relationships, with the management contracts following the personnel as they changed positions or companies. Fimberg testified that property management contracts could always be changed. Consequently, without a stable relationship between the management company and the owners, the property management contracts had little intrinsic value beyond one month's management fees.

Furthermore, a management company in Texas required a real estate license to operate. Woodward held a real estate license for BLP. If he left, BLP would lack a real estate license to operate. Woodward did not have an employment contract with BLP. He was not subject to a non-competition agreement or a non-solicitation agreement. He could leave BLP at any time.

By March 2000 Williams, Woodward and Fimberg had determined that BLP could not repay the note without significant restructuring. They had requested that the principal of the note be reduced by 90%. Williams and Woodward had decided not to make the April note payment after making the March distributions to force the issue. Without new property management contracts, Williams and Woodward concluded that BLP's assets could not service its debt. Fox, Equity's chief operating officer at the time of the transaction, testified that she called Fimberg on April 4, 2000. Fimberg told her that BLP was not worth the amount of the note, and that if Equity did not restructure the note, Fimberg would move his properties to another management company. Fimberg confirmed this conversation.

Williams, Woodward and Fimberg controlled about 30 of the 50 properties managed by BLP. They could terminate those contracts with BLP on 30 days notice. By the time of the March 2000 transfers their relationship with BLP had become precarious. A willing buyer doing due diligence would have been aware of this situation. Absent a relationship with Williams, Woodward and/or Fimberg, the court infers that a willing buyer would not pay more than one month's fees for the contracts they controlled.

With regard to the other contracts, a willing buyer with a real estate license would have had an opportunity to retain the contracts. Consequently, the value of the contracts for properties not controlled by Williams, Woodward and/or Fimberg would have been greater. But, as McGwire testified, their value would hinge on the relationship of the owners of the property to Williams, Woodward and Fimberg. None of the witnesses presented the court with a useable measurement for those contracts. The life of the real estate projects does not inform the value of contracts with a 30 day cancellation clause. An accounting amortization principal does not inform the court of the amount a willing buyer would pay in the marketplace. However, the court notes that Williams, Woodward and Fimberg believed the note should be discounted by 90%, which would leave its amount slightly higher than one month's fees generated from all the management contracts. The court concludes that a willing buyer would pay somewhat more than that, but would not pay more than three months of fees for the non-controlled contracts, figuring one month of certain income and two months risk to retain the contracts. More than that

would make no business sense, since a management company with a real estate license and a sound reputation would have a fair prospect of obtaining the contracts without purchasing the business, should BLP lose its real estate licensed officer.

BLP had gross receipts of $4,818,871.97 for March 2000. From those receipts, BLP earned management fees of $197,758.30. Assuming 60% of that was controlled by Williams, Woodward and/or Fimberg, a willing buyer would pay 60% of that amount, or $118,655, for those contracts. For the remaining 40%, a willing buyer would likely pay $237,310 ($79,103 times three months) for the remaining contracts.

The court finds that the property management contracts had a fair value of $355,965. By contrast, if BLP closed its business in March 2000, the fair value would be reduced to the amount of the March fees, $197,758.30.

After the March 2000 transfers, as of April 1, 2000, BLP had $275,000 in cash; $197,000 in fees outstanding owed by clients for whom BLP controlled bank accounts; $72,755 in fees outstanding owed by clients for whom BLP did not control bank accounts; and a $135,000 claim against Equity for the human resource dispute. BLP also held software program licenses used for the property management. Without the contracts, the court finds no evidence of marketable value for the licenses.

The balance sheet analysis at fair value:

| ASSETS | LIABILITIES |
|---|---|
| Cash | $1,833,333 |
| $275,000 | |
| Receivables (controlled accounts) | |
| $197,000 | |
| Receivables (non-controlled accounts) | |
| $72,755 | |
| Human resource claim | |
| $135,000 | |
| Contracts | |
| $355,965 | |
| Total | |
| $1,035,720 | |

At the time of the March 2000 transfers, BLP was insolvent. Had the transfers not been made, BLP would have still been insolvent. BLP remained insolvent thereafter.

▮ The defendants contend that the trustee should be estopped from asserting insolvency. As early as January 2000 BLP told Equity that its business was not worth the debt on the note. Fimberg requested a 90% discount. Woodward and Williams tried to leverage Equity into negotiations to restructure the note. But Equity declined to renegotiate

the note. Equity took the position that BLP's value exceeded the debt. Equity is a sophisticated real estate company. Its witnesses testified to their experience and sophistication in that industry. If this were a law suit brought by Equity, the court would be inclined to estop Equity from now claiming that BLP was correct in January 2000. But this is an action by the Chapter 7 trustee. Under the Bankruptcy Code, for a fraudulent conveyance avoidance claim, the trustee stands in the shoes of a third person, not bound by the actions of creditors. *Zedda,* 103 F.3d at 1201. Therefore, the trustee is not estopped or precluded from bringing this claim.

Based on these findings and conclusions, the trustee shall have a judgment avoiding the transfers of March 2000 in the amount of $627,000 pursuant to 11 U.S.C. § 544(b) and Tex. Bus. & Com.Code § 24.005(a)(1), or, alternatively, § 24.006. The other challenged transfers may not be avoided.

### Fiduciary Duty

■ The officers of a corporation owe a fiduciary duty to the corporation and its shareholders. *Lewis v. Knutson,* 699 F.2d 230, 235 (5th Cir.1983). The duty includes a duty of care and a duty of loyalty. *Resolution Trust Corp. v. Acton,* 844 F.Supp. 307, 313 (N.D.Tex.1994). When a corporation enters a zone of insolvency, the fiduciary duty shifts from the shareholders to the creditors of the corporation. *See In re Hechinger Inv. Co. of Delaware,* 280 B.R. 90, 92 (D.Del.2002).

From March 2000 until late September 2000, Williams, Woodward and Barnett served as officers of BLP and thus held a fiduciary duty to BLP and its shareholders. They along with Fimberg and Wolfe, were the shareholders.

However, from January 2000, they believed that BLP's debts substantially exceeded its assets fairly valued as a going concern. Fimberg communicated that position to BLP's major creditor, Equity. Thus, by January 2000 the officers of BLP believed BLP to be insolvent, by at least one measurement of insolvency. BLP had entered the zone of insolvency. Their fiduciary duty shifted to BLP and its creditors.

■ In March 2000 Williams and Woodward caused BLP to transfer $627,000 to BLP's equity holders at a time when BLP lacked the cash to make the April 1, 2000, note payment. As previously found, BLP did not receive reasonably equivalent value in exchange for the transfer. Officers of an insolvent corporation breach their fiduciary duty by transferring funds to themselves, in effect, as equity holders, to the detriment of the corporation's creditors. *Erstmark,* 2002 WL 1792213; *In re Performance Nutrition, Inc.,* 239 B.R. 93, 110 (Bankr.N.D.Tex. 1999).

Williams, Woodward and Barnett contend, however, that the trustee must be estopped from pursuing the breach of fiduciary claim. A party may only invoke equitable estoppel if it detrimentally relied on the misrepresentations of the other party. *Neiman–Marcus Group, Inc. v. Dworkin,* 919 F.2d 368, 371 n. 4 (5th Cir.1990) (addressing Texas law on equitable estoppel).

■ Unlike the trustee's avoidance powers under § 544, the trustee does not stand in the shoes of a bona fide third party on a breach of fiduciary duty claim. Rather, with regard to non-core state law claims, he stands in the shoes of the debtor as of the time of the claim. Sherman pursues this claim based on the fiduciary duty to BLP and its creditors. But Equity constitutes the major creditor, and virtually the only entity allegedly damaged by a breach of fiduciary duty.

After Fimberg informed Equity in January 2000 that BLP believed itself to be insolvent, Equity conducted its assessment of BLP's assets. Equity was a sophisticated player in the multi-family residential real estate market. Equity understood property management contracts and property management companies. Equity concluded that BLP's assets supported its debt structure as evidenced by the note. Fimberg believed Equity did not use the correct income multiple for valuation. But Equity disagreed. For all practical purposes, Equity gave BLP the green light to proceed as if it were solvent. The court agrees with the defendants. Equity cannot reject BLP's financial assessment and refuse to renegotiate the note based on its conclusion that BLP's assets support the note and then complain of a breach of fiduciary duty when the officers proceed to distribute the excess cash flow from BLP's 1999 operations. When the fiduciary advises a sophisticated beneficiary of a financial situation and the beneficiary effectively authorizes the fiduciary to proceed, the sophisticated beneficiary cannot then complain when the fiduciary proceeds. The court therefore applies the equitable estoppel doctrine to the breach of fiduciary duty claim concerning the March 2000 transfers.

The officers of BLP did not breach their fiduciary duty to BLP and its creditors when they resigned in September 2000, formed Myan and transferred some property management business to Myan. Equity accelerated the note on April 11, 2000. Equity commenced litigation in May 2000. Williams, Woodward and Barnett nevertheless carried on the business of BLP throughout the summer of 2000. Indeed, with the acceleration of the note, Williams testified that he was unsure of his responsibilities. With the ultimate deterioration of their relationship with Equity, Williams and Woodward formed Myan.

Williams and Woodward were not subject to a non-competition agreement with BLP or Equity. They were not subject to a non-solicitation agreement with BLP or Equity. Fox agreed that neither the stock purchase agreement nor the note prevented Williams and Woodward from resigning nor from forming a property management business after they resigned. They controlled real estate with fiduciary duties to the other interest holders in that real estate. The stock purchase agreement permitted their exercise of discretion regarding property management contracts when their fiduciary duty to other interest holders required. The Equity witnesses at trial agreed that customarily in the industry, property management contracts go with management companies having a relationship to the owners of the real estate.

Williams, Woodward and Barnett operated BLP, assuring that it performed its property management functions, until they resigned in late September 2000. Wolfe performed her responsibilities to BLP during that time as well.

Following acceleration of the note and the commencement of litigation and considering how the industry works, Equity, which was essentially BLP's only creditor, should have expected that the property management business would be moved. Neither the trustee nor Equity can invoke a fiduciary duty to BLP to impose a non-competition or non-solicitation contractual requirement when none existed. The court concludes that the formation of Myan did not involve a breach of fiduciary duty.

BLP transferred funds to lawyers and through Myan to accountants. Based on the findings made above, these transfers did not constitute a breach of fiduciary duty. Under the state court receivership,

the funds to the law firms either were used to pay for legal services to BLP or remained in the law firm's trust accounts. The transfers to Myan paid for accounting services BLP owed its customers.

Wolfe never served as an officer of BLP and therefore had no fiduciary duty to BLP and its members or creditors. The Williams Family Trust was never an officer, director or employee of BLP.

## Breach of Contract

 As discussed previously, in the stock purchase agreement, FSC Realty, Fimberg, Williams and Woodward agreed that:

> ... for so long as amounts remain unpaid on the Promissory Note, the Property Owners will use their best efforts to cause all entities owning residential rental property that the Property Owners, individually or jointly with others with whom they are acting in concert, own or control (the 'Properties') to enter into management contracts with Buyer [BLP] to the exclusion of other property management companies, subject to the Property Owners' exercise of their fiduciary duties, if any, owed to other interest holders in such entities by virtue of the Property Owners' direct or indirect position or relationship with such entity.

Stock Purchase Agreement § 5.6. Sherman contends that Williams and Woodward breached this provision by causing properties they controlled to contract with Myan after they resigned from BLP. Williams and Woodward contend that the provision did not apply for the life of the note, and, besides, upon their resignation, they had no contractual obligation to maintain contracts with BLP. In addition, they contend that their fiduciary duties to the other interest holders in properties they controlled compelled the transfer of the property management contracts following the commencement of litigation by Equity and the effective demise of BLP.

Following the execution of the stock purchase agreement, Williams, Woodward, Fimberg and FSC Realty all caused properties they controlled to contract for property management with BLP. They did not terminate those contracts until they resigned from their officer positions with BLP. When they resigned, amounts remained unpaid on the note. Consequently, under the plain language of the stock purchase agreement, they remained subject to the best efforts commitment to cause entities they controlled to contract with BLP.

However, as discussed under the fiduciary duty section above, the best efforts commitment was itself subject to their fiduciary duty to their fellow property owners. Williams, Woodward and Fimberg all testified that by September and October 2000, that duty required the movement of property management to a new entity. In their view, BLP's assets did not support its debt structure since at least January 2000. BLP had defaulted on the note. Equity had commenced litigation against BLP and them. They ultimately resigned as officers and as managing member. No contractual provision prohibited these acts. Indeed, they had a right to resign. BLP was left without a real estate license. In the industry, property management contracts could be terminated on 30 days notice and property owners customarily caused properties they controlled to be managed by property management companies with which they had a relationship. Williams, Woodward and Fimberg all testified that under the circumstances they had no guarantee that BLP could perform and/or maintain property management services for the properties. Barnett had resigned as well. Wolfe left for other employment. Neither Fox nor Van Auken contradicted their testimony regarding

their obligations to other property owners nor testified otherwise.

The court thereupon concludes that pursuant to the fiduciary duty proviso, Williams and Woodward did not breach § 5.6 of the stock purchase agreement.

### Conspiracy

 The elements of a claim of civil conspiracy are: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as a proximate result. *Jackson v. Radcliffe*, 795 F.Supp. 197, 209 (S.D.Tex.1992). The court has found that the officers of BLP did not breach their fiduciary duty and did not breach § 5.6 of the stock purchase agreement. Accordingly, the trustee has not established that they committed one or more unlawful, overt acts. The court therefore concludes that the trustee did not establish that the defendants engaged in a civil conspiracy. Under the Bankruptcy Code, the remedy for avoiding a fraudulent transfer is addressed by a specific statutory provision, 11 U.S.C. § 550. Consequently, the court does not consider the fraudulent transfer under the civil conspiracy claim. To do so could lead to a result that expands remedies beyond § 550. The court cannot undermine or circumvent a specific Code remedy.

### Judgment

To the extent that a transfer is avoided under § 544, the trustee may recover, for the benefit of the bankruptcy estate, the property transferred, or, if the court so orders, the value of such property, from the initial transferee of such transfer or the entity for whose benefit the transfer was made. 11 U.S.C. § 550(a)(1)(2002). Under § 544, the court has avoided the transfers of March 2000 totaling $627,000. The transfers were made to the following

initial transferees in the following amounts: to FSC $248,150; to Woodward $141,075; to the Williams Family Trust $141,075; to Barnett $31,350; and to Wolfe $31,350. The trustee has settled with FSC, leaving Woodward, Williams Family Trust, Barnett and Wolfe.

The defendants argue that the affirmative defenses of waiver, ratification and estoppel should bar a judgment for the trustee. As discussed above, the trustee under § 544 trumps those affirmative defenses for an avoidance action. Neither § 544 nor § 550 codifies the defenses nor makes them applicable to the trustee in an avoidance action.

The trustee shall recover a judgment against Woodward, Williams Family Trust, Barnett and Wolfe in these respective amounts.

### Exemplary Damages

 Section 550 does not provide for the recovery of exemplary damages. The trustee has recovered under Texas fraudulent conveyance laws. Under Texas law, exemplary damages are available if the plaintiff has in fact sustained actual loss or injury. *Mack v. Newton*, 737 F.2d 1343, 1367 (5th Cir.1984). However, as concluded above, the court cannot invoke state law remedies to circumvent or undermine the specific remedy legislated by Congress for the avoidance of a fraudulent transfer.

The Trustee has not recovered a judgment for breach of fiduciary duty or breach of contract, so those claims provide no basis for exemplary damages.

### Order

Based on the foregoing,

**IT IS ORDERED THAT** the trustee shall have a judgment, pursuant to 11 U.S.C. §§ 544(b) and 550(a)(1), of $141,075 against Woodward, $141,075 against the

Williams Family Trust, $31,350 against Barnett and $31,350 against Wolfe. The judgment shall provide for pre-judgment interest of 2.40% from May 21, 2002, the date the trustee intervened in the litigation, and post-judgment interest at the federal rate from the date of the entry of judgment.

**IT IS FURTHER ORDERED THAT** the trustee shall serve and file a brief within 21 days from the date of entry of this order addressing whether the trustee may recover his attorney's fees. The brief shall be accompanied by an affidavit and supporting exhibit addressing the amount of fees requested. The defendants shall serve and file a response brief within 21 days of service of trustee's brief. The trustee may file a reply brief within 7 days of service of the defendant's brief. The court may decide the issue on the pleadings or may set the matter for a hearing.