In re LEXINGTON OIL AND GAS LTD., Company, Oak Hills Drilling and Operating LLC, Debtors.

Gerald R. Miller, Trustee, Plaintiff,

v.

James C. Dow, Alexander Cox, and Grant Atkins, Defendants.

Bankruptcy No. 08–80228.
Adversary No. 08–08029.

United States Bankruptcy Court,
E.D. Oklahoma.

Jan. 27, 2010.

**356**

Patrick J. Malloy, III, Malloy Law Firm, P.C., Tulsa, OK, Richard M. Paul, III, Ashlea Schwarz, Stueve Siegel Hanson LLP, Kansas City, MO, for Plaintiff.

Carl J. Carlson, Carlson & Dennett, P.S., Seattle, WA, Timothy T. Trump, Conner & Winters, Tulsa, OK, for Defendants.

## MEMORANDUM OPINION

TERRENCE L. MICHAEL, Bankruptcy Judge.

Investing is a risky business. Investment opportunities come in all sizes, shapes, and colors. At one end of the risk spectrum lies shareholder equity, or stock. In most cases, stock holders have the most to gain and to lose: if the business succeeds, they stand to receive a monumental return on their investment. This is the stuff of which fortunes are made. However, if the business fails, stockholders are the last to be paid, if they are paid at all. At the other end of the risk spectrum is the over-secured loan. If a business fails, the holder of the over-secured loan recovers all of his or her investment through the liquidation of the collateral securing the loan. Given the relative lack of risk in an over-secured loan, the return on such an investment is ordinarily far less than one might expect from an equity investment.

What lies at the core of this case is an attempt to marry stock and over-secured loans to create the best of all possible worlds: a fully collateralized (and thus risk-free) investment with an unlimited upside. As one might expect, the dispute arose after the business failed, and there is not enough money to go around. The plaintiff, the trustee in bankruptcy charged with collecting assets and distributing them to creditors, contends that the defendants cannot have their cake and eat it too, i.e., that the transactions at issue must be treated as equity, and placed at the bottom of the distribution totem pole. The trustee also asks the Court to punish the defendants for having the audacity to

accept repayment of the amounts they claim were owed them. The defendants claim that the transactions qualify as valid secured loans that were properly repaid from proceeds of liquidated collateral. All in all, a very interesting and complex question. The following findings of fact and conclusions of law are made pursuant to Federal Rule of Bankruptcy Procedure 7052.

## Jurisdiction

The Court has jurisdiction over this matter pursuant to 28 U.S.C.A. § 1334(b),[1] and venue is proper pursuant to 28 U.S.C.A. § 1409. Reference to the Court of this adversary proceeding is proper pursuant to 28 U.S.C.A. § 157(a). These Chapter 7 bankruptcy cases have been referred to this Court by general order of the United States District Court for the Eastern District of Oklahoma. This is a core proceeding as contemplated by 28 U.S.C.A. § 157(b)(2)(A) and (H).

## Findings of Fact

Oak Hills Drilling and Operating International, Inc. ("International") and its subsidiary, Oak Hills Drilling and Operating LLC ("Oak Hills"), were formed in late 2004. Their initial business model was summarized in an "Investment Package":

> With soaring oil and gas prices, inevitable domestic energy shortages, and positive long term market outlook we have taken advantage of the extreme shortage of drilling and support equipment in the domestic U.S. oil and gas industry to create a solid and secure business investment. We have assembled and made deposits on a "Wilson

Giant" Triple Tier Drilling Rig and associated operational equipment, including a pulling unit, trucks, backhoe, bulldozer and sundry support equipment. With the use of existing contracts for rig rental and operation and industry demand, the company can start operations within 30 days and project profitability after the Company's first quarter repatriating investment capital within 12 months to investing parties. The business premise requires the contributions of four equal 25% partners that will own the financial and operating businesses, each contributing combinations of straight capital, equipment, and capital and revenue contracts.

\* \* \*

> [I]nvestment instruments utilized primarily are "debt classed" to repatriate Invested capital without tax burden to the investing party.[2]

The Investment Package was prepared by Grant Atkins ("Atkins"). Atkins was involved in the formation of Oak Hills and International, and had some manner of involvement in their corporate affairs.[3] According to the Investment Package, the relationship of International and Oak Hills was to be that "[t]he operating subsidiary [Oak Hills] will contain all day to day operations of the business while the parent company [International] will allow [sic] financial and administrative functions." [4]

In the Investment Package, International sought four separate investors, each to own 25 per cent of International. Stock was to be purchased at a price of $ 1 per share, with the balance of the investment to be in the form of a "debt instrument."

---

1. Unless otherwise noted, all statutory references are to sections of the United States Bankruptcy Code, 11 U.S.C.A. § 101 *et. seq.* (West 2010).

2. *Plaintiff's Exh. 7–02.*

3. Although Atkins is a named defendant in this adversary proceeding, all claims against him have been fully settled as of the date of this Memorandum Opinion.

4. *Plaintiff's Exh. 7–04.*

The Investment Package contained this explanation of the reasons for the structure:

> Any cash, equipment, or contracts provided in kind to Oak Hills Drilling & Operating International, Inc. will be valued and provided to the company by "debt instrument" with subsequent loan repayment from profits applied pro-rata to outstanding loans. After loan repayment, profits not applied to reinvestment initiatives will be distributed according to shareholding via dividend. Contributions by shareholders will be advanced to the subsidiary interest as an intercompany loan that will be eliminated upon accounting consolidation. *In this method, investment used to start the company can be repaid with the minimum in investor tax burden.*
>
> **Loan Instrument:** The loan instrument will be utilized to value cash, equipment, or contracts provided in kind to Oak Hills Drilling & Operating International, Inc. as after-tax investment should flow back to each investor without incurring tax burden. The value of each loan provided by each shareholder will vary according to valuation of each investor's contribution.
>
> **Loan Repayment:** Repayment of each loan from profits not applied to corporate capital upgrades and purchases will be repaid according to pro-rata loans outstanding of each shareholder and not shareholder ownership interest. Loans will bear interest at 9% per annum simple interest accrued monthly and create a separate loan interest account liability due to each shareholder.
>
> **Investment Security—GSA:** A General Security Agreement will be applied by Oak Hills Drilling & Operating International, Inc. against all equipment and assets of the subsidiary interest, Oak Hills Drilling & Operating, LLC, providing the loan holders of the parent company with pro-rata security for their contributions according to the size of their loan contribution valuation.[5]

Though crafted in the form of a solicitation, the Investment Package identified four potential investors by name: Brent Pierce, Doug Humphreys ("Humphreys"), Alexander Cox ("Cox"), and James Dow ("Dow"). The opportunity piqued the interest of Dow, Cox, and Humphreys.

Dow is a resident of Seattle, Washington. After obtaining a degree in biology with an education certification, he spent one year teaching, and then turned his attention to the residential contracting business, which he has been engaged in for the past thirty years. Very little evidence was adduced about Dow's financial acumen. When on the witness stand, Dow demonstrated little knowledge of his own financial holdings. He could not remember reviewing documents and was unfamiliar with many documents that he admitted contained his signature. When pressed for detail regarding his understanding of this and other of his personal financial dealings, Dow repeatedly testified that his investment affairs were handled by his "chief financial officer," Mike Frankfurter. Mr. Frankfurter did not testify at trial.

Dow learned of the investment opportunity in International through an investment advisor. According to Dow, although he reviewed the Investment Package, he made the decision to place money in International largely upon the recommendation of Mr. Frankfurter. On or about October 27, 2004, Dow caused a wire transfer of $500,000 from his accounts to be made to fund his investment in International. Although the evidence was a bit muddled on this issue, the Court finds for purposes of

---

5. *Plaintiff's Exh. 7–05* (emphasis added).

its decision that Dow and International allocated $2,500 to the purchase of 100 shares of International stock, with the remaining $497,500 to be treated as a "loan." The 100 shares of International stock represented 25 per cent of all outstanding and issued International stock.

While the timing of Dow's advance of money to International is established in the record, the timing with respect to the documentation of the transaction is not. In order to memorialize the advance of funds by Dow, International executed a promissory note in favor of Dow in the principal amount of $497,500 (the "Dow Note").[6] The Dow Note is "provided, dated and made effective as of" October 29, 2004 (two days after the transfer of funds). If one reads the operative documents, the Dow Note was executed pursuant to a document entitled "U.S. Share Private Placement Subscription and Loan Agreement" (the "Dow Private Placement Agreement").[7] Although "[d]ated at Seattle, Washington, U.S.A. on this 29th day of October, 2004," [8] the Dow Private Placement Agreement was not executed until sometime in January 2006.[9] Given that: (1) the Dow Note and the Dow Private Placement Agreement were part and parcel of the same transaction; (2) the Dow Private Placement Agreement was executed in January of 2006; and (3) there is nothing in the record to establish the date of execution of the Dow Note, the Court cannot help but wonder if the Dow Note was executed in January 2006 concurrently with the execution of the Dow Private Placement Agreement. The Court finds the statement in the Dow Note that it was "provided, dated and made effective as of" October 29, 2004 to be of no probative value in determining the actual date of execution of the Dow Note.

The Dow Note was repayable two years after date of issuance. It was to bear interest at the annual rate of nine percent, compounded semi-annually. It contains no provision for any payment of interest prior to its due date.

Dow had little recollection of the circumstances surrounding the execution of or his receipt of the Dow Note. Dow admitted that he caused the $500,000 to be transferred out of his accounts before he received the Dow Note. At no time did Dow consult with counsel regarding this transaction. Notwithstanding these facts, Dow testified that had he known his $500,000 might be treated as equity, he would not have advanced any funds, because the infusion of equity in this type of business operation was simply "too risky." [10] Dow's testimony in this regard is not credible. He offers no explanation as to why, if he were in fact concerned with the legal structure of the transaction, he paid no attention to it.

6. *Plaintiff's Exh. 13.*

7. *Plaintiff's Exh. 12.*

8. *Id.* at 12–30.

9. *See Transcript of Proceedings held Sept. 28, 2009, Docket No. 84*, page 34, line 6 through page 38, line 25. At trial, Dow had no recollection of when he signed the Dow Private Placement Agreement. The parties agreed that the issue of when Dow signed the Dow Private Placement Agreement was the subject of a prior deposition, and that, in that deposition, Dow testified that to the best of his recollection he signed the Dow Private Placement Agreement sometime in January 2006. While not the most precise evidence one could hope for, this was all the evidence provided on the issue. On this basis, the Court finds that the Dow Private Placement Agreement was signed by Dow in January 2006.

10. *Transcript of Proceedings held Sept 28, 2009, Docket No. 84*, page 81, lines 3 through 12.

Cox is a former partner in the accounting firm of Ernst and Young with a background in real estate development. He first learned of the investment opportunity in International from Brent Pierce. Cox testified that he had experience in ventures similar to International prior to his investment in International. Cox did not review the Investment Package prior to making his decision to invest. Instead, he received information regarding the investment opportunity from Brent Pierce. On the basis of that information, and his own business acumen and experience, Cox made the decision to invest in International.

On December 7, 2004, Cox caused the sum of $250,000 to be wired from one of his accounts to the Royal Bank of Canada for the benefit of International. On that same day, International issued a stock certificate to Cox for 100 shares of International common stock.[11] As with Dow, the 100 shares of International stock was 25 per cent of the total issued and outstanding shares in the company. As part of the same transaction, International issued a promissory note to Cox in the amount of $497,500 (the "Cox Note").[12] Although the note states on its face that it was "provided, dated and made effective as of the 7th day of December, 2004," there is no other evidence in the record to establish when this note was actually created.

At trial, Cox was asked why the note amount differed from the amount of his initial advance to International. Cox testified that the note represented the maximum he would be required to advance and that, notwithstanding the face amount of the note and the fact that the note made no mention of subsequent advances, he expected to be repaid only the sums actually advanced. Cox testified that Brent Pierce initially advised Cox that International "probably" would only need the initial advance of $250,000, and that Cox entered into the transaction expecting the $250,000 advance to be his only advance of funds.

It appears that an entity called Newport Capital Corporation ("Newport") also invested cash in International. In the documentation received into evidence at trial, there is a note from International to Newport in the principal amount of $381,000 (the "Newport Note").[13] Unlike the Dow and Cox advances, however, no evidence was presented to show when (or for that matter, if) Newport advanced those sums.

The fourth investor in International was Humphreys. Unlike the others, Humphreys did not invest cash into International. Instead, he contributed "some equipment" and "sweat equity" in ex-

---

11. *Plaintiff's Exh. 19.*

12. *Plaintiff's Exh. 18.* The record is ambiguous as to the intended amount of the note and the intended price to be paid for stock in International. The Cox Note had a stated face amount of $499,750: however, both Dow and Cox stated that there was a question as to whether the price of the stock was $250 or $2,500, but that the difference in stock value was immaterial to them. For purposes of its decision, the Court presumes that Dow and Cox both intended to pay $2,500 for their stock in International, with a balance of $497,500 provided for under the Dow Note and the Cox Note.

13. *See Defendant's Exh. K.* The Newport Note was "provided, dated and made effective as of" December 8, 2004. There was no testimony regarding the note, nor was there any testimony to establish if and when Newport actually advanced monies to International. However, the parties allude to such advances by Newport in their pre-trial order, and the Court will assume that Newport advanced some manner of monies to International. *See Pre–Trial Order, Docket No. 69* (hereafter *"Pre–Trial Order"*), at § III, ¶ (5).

change for his stock in International.[14] Humphreys did not receive a promissory note from International, even though such a note was referred to in the Investment Package.[15] The Court received no evidence as to the value of the equipment contributed by Humphreys except the statement in the Investment Package that the equipment to be contributed by Humphreys would be worth $200,000. The Court does not consider such a statement in such a document to be of probative value.

On February 25, 2005, Cox advanced an additional $150,000 to International.[16] Cox testified that this advance was made pursuant to the Cox Note. Approximately one month later, Cox wired an additional $100,000 to Newport.[17] Cox claims that this transfer represented a repayment of $100,000 advanced by Newport to International on his behalf. No documentary evidence was offered in support of this alleged advance to International by Newport. In August 2005, Cox wire transferred an additional $300,000 to Oak Hills. According to Cox, this transfer represented a "purchase" of a portion of the Newport Note. At the time, Cox had never seen the Newport Note. Cox further testified that even though the monies were supposedly given to purchase an interest in the Newport Note, they were sent to Oak Hills at Newport's instruction. The only documentation with respect to this alleged assignment of debt between Newport and Cox is an unsigned "Assignment of Debt Agreement" purportedly between Newport and Cox, "made and dated for reference as effective on this 23rd day of January, 2006," some four months after the payment of funds to Oak Hills by Cox.[18] Cox was unable to find a copy of this assignment in his documents, and did not believe that he had signed such an assignment.

If one divides the total amount of the International debt ($1,378,000) into the amount paid for the International stock ($10,000), the ratio of corporate debt to shareholder equity for International at its inception and at the time of the alleged loans from Dow, Cox, and Newport was approximately 137:1.[19] The analysis does

---

14. *Transcript of Proceedings held Sept. 29, 2009, Docket No. 85,* page 79, lines 5 through 12; *see also Plaintiff's Exh. 7–06.*

15. *Plaintiff's Exh. 7–06.*

16. *Plaintiff's Exh. 25.*

17. *Plaintiff's Exh 26.*

18. *Plaintiff's Exh. 35.*

19. The calculation is as follows, assuming the monies represented by each promissory note represent legitimate loans to International:

**Debt:**

| | |
|---|---|
| Dow: | $497,500 |
| Cox: | $497,750 |
| Newport Capital Corporation: | $381,000 |
| **Total Debt:** | **$1,376,000** |

**Equity:**

| | |
|---|---|
| Dow: | 100 shares at $25 per share: $2,500 |
| Cox: | 100 shares at $25 per share: $2,500 |
| Newport Capital Corporation: | 100 shares at $25 per share: $2,500 |
| Douglas Humphreys: | 100 shares at $25 per share: $2,500 |

not include any debt that may have been owed to Humphreys in exchange for his contribution of equipment.[20]

The funds advanced by Dow and Cox to International were advanced by International to Oak Hills and documented on the books of both companies as an inter-company loan. They were used to purchase an oil and gas drilling rig (the "Rig"). The Rig was the centerpiece of the Oak Hills operation.[21]

On January 20, 2006, Dow, Cox, and the other owners of International sold all of their outstanding shares of International to Lexington Resources, Inc. ("Resources"), a publicly-traded company, in exchange for 6,000,000 shares of Resources.[22] Dow and Cox each received 1,500,000 shares of Resources (i.e., 25% of the 6,000,000 shares). Although the transaction was documented in January 2006, the parties made the transaction effective "as at [sic] September 22, 2005."[23] The effect of this transaction was to allow Resources to become the owner of all of the outstanding stock of International.

As part of the 2006 acquisition of International by Resources, the parties agreed that a pro rata portion of the above-referenced inter-company obligation between International and Oak Hills would be assigned to Dow, Cox, and Newport. However, no formal written assignment of that inter-company debt was ever executed. Instead, Oak Hills executed new secured loan documents directly in favor of Dow, Cox, and Newport (the "2006 Oak Hills Documents"). These documents purported to grant Dow and Cox a lien upon all personal property of Oak Hills, including all equipment, accounts receivable, intangibles, and other personal property.[24] There is no evidence that the security interest granted under these documents was ever perfected.

The promissory note between Oak Hills and Cox was in the amount of $497,500.[25] The promissory note between Oak Hills and Dow was in the same amount.[26] Neither of these notes account for any accrual of interest prior to January 20, 2006, upon the amounts allegedly loaned by Dow and Cox in late 2004 and early 2005, as represented by the Dow Note or the Cox Note. No new monies were advanced in connection with these loan documents.[27]

In early 2006, Oak Hills made the decision to commence drilling wells in what was described as the "Barnett Shale"

**Total Capital:** 400 shares at $25 per share: $10,000

$1,376,000/$10,000 = 137.6/1

**20.** The Investment Package contains a statement that Humphreys is to receive a note in exchange for his contribution of equipment. See *Plaintiff's Exh. 7–05* ("Any cash, equipment, or contracts provided in kind to [International] will be valued and provided to the company by 'debt instrument' with subsequent loan repayment from profits applied pro-rata to outstanding loans.") and *Plaintiff's Exh. 7–06* (describing the Humphreys contribution in detail). However, the record is bereft of any note from International to Humphreys.

**21.** *Plaintiff's Exh. 7.*

**22.** *Pre–Trial Order,* § III,¶ 6.

**23.** *Plaintiff's Exh. 32; see also Pre–Trial Order,* § III, ¶ 6.

**24.** *Plaintiff's Exhs. 37 and 42.*

**25.** *Plaintiff's Exh. 40.*

**26.** *Plaintiff's Exh. 36.*

**27.** *Pre–Trial Order,* § III, ¶ 7.

property in Texas. According to Humphreys, such drilling was an expensive and risky process. Oak Hills did not have sufficient capital to underwrite these drilling efforts and relied largely upon trade credit to support its operations. According to Humphreys, Oak Hills had a large trade debt during all of 2006, and had problems paying that debt on a timely basis. As the year progressed, trade creditors began making demands for payment. Some filed liens against the wells. Others filed suit to collect their debts. Eventually drilling ceased in late summer of 2006 due to lack of funds. As of May 29, 2007, the records of Oak Hills reflected trade payables of $5,103,304.82.[28] The overwhelming majority of these debts were invoiced to Oak Hills in 2006. A few invoices were received by Oak Hills in early 2007.

Other evidence indicates that Resources and Oak Hills were in dire financial straits as early as March 31, 2006. On May 14, 2006, Resources filed its Form 10–QSB Report (the "10–QSB") with the Securities and Exchange Commission.[29] The 10–QSB reflected the financial position of Resources and its subsidiaries, including Oak Hills, as of March 31, 2006. According to the financial information contained in the 10–QSB, the combined Resources entities experienced a net loss of $3,809,589 during the first three months of 2006. Cash and cash equivalents dropped from $520,332 to $10,608 during the same period, while trade debt increased from $936,265 to $2,623,314. The notes included in the 10–QSB reflect uncertainty regarding the ability of Resources and its subsidiaries to continue in existence:

**Going Concern**

The consolidated financial statements have been prepared on the basis of a going concern which contemplates the realization of assets and the satisfaction of liabilities in the normal course of business. The Company has a working capital deficiency of $4,442,422 at March 31, 2006, has incurred losses since inception of $19,916,107 and further losses are anticipated in the development of its oil and gas properties raising substantial doubt as to the Company's ability to continue as a going concern. The ability of the Company to continue as a going concern is dependent on raising additional capital to fund ongoing losses and property development and ultimately on generating future profitable operations. The Company will continue to fund operations with advances and debt instruments, as well as further equity placements.[30]

According to Humphreys, Oak Hills knew in early 2006 that its survival was dependent upon raising additional capital. No such capital was forthcoming, and the decision was made in August of 2006 to cease drilling operations.

As part of the wind down of the Oak Hills business operations, a decision was made by management in late 2006 to sell the Rig. After considerable negotiations, the Rig was ultimately sold to Innovative Energy Services for the sum of $3,100,000.[31] The $3.1 million figure represented by far the highest and best offer for the Rig: according to Humphreys, the next highest bid was approximately $2.4 million. The sale was closed and Oak Hills received the proceeds from the sale of the Rig in early January of 2007. According to a January 5, 2007, e-mail from Atkins to

**28.** *Plaintiff's Exh. 59.*

**29.** *Plaintiff's Exh. 49.*

**30.** *Plaintiff's Exh. 49–13.*

**31.** *Plaintiff's Exh. 54.*

Craig Kincaid, who was then employed by Oak Hills as its accountant and controller, the proceeds from the sale of the Rig were to be distributed as follows:

| | |
|---|---:|
| Convertible Note Holders—Transfer to Lang Michener | $ 900,000.00 |
| Payout triplex pump | 374,000.00 |
| Payout OHD International Rig Loan P & I to Jan 8/07 | 1,524,653.07 |
| OHD LLC 146 accounts payable under $5,000 | 201,000.00 |
| Payment to SB-2 penalty payments | 100,346.93 |
| | |
| Total: | $3,100,000.00[32] |

The item "Payout OHD International Rig Loan P & I to Jan 8/07" includes the payments made to Dow and Cox that are the subject of this adversary proceeding.

On January 5, 2007, Oak Hills transferred $2,525,000 of the proceeds of the sale of the Rig to a bank account held by Lexington Oil & Gas Ltd., Co. ("Lexington"), a wholly owned subsidiary of Resources. Out of this money, Dow received $597,120.25, and Cox was paid $858,011.15.[33] According to both Dow and Cox, the amounts they were paid represented a return of the principal amount they were owed on the notes, plus interest from the "effective date" of the Dow Note and the Cox Note (October 2004).

The financial fortunes of Oak Hills did not rebound after the sale of the Rig. Apparently, Lexington was also in financial trouble, as it filed an original petition for relief under Chapter 11 of the United States Bankruptcy Code on March 4, 2008. Upon motion of the United States Trustee, Lexington was converted to a case under Chapter 7 of the Code by agreed order entered on April 22, 2008.[34] Upon conversion, Gerald R. Miller ("Miller") was appointed to serve as Chapter 7 Trustee. Oak Hills filed an original petition for relief under Chapter 7 of the United States Bankruptcy Code on June 11, 2008. Miller was also appointed as Chapter 7 Trustee in the Oak Hills case. The estates of Lexington and Oak Hills were substantively consolidated on July 24, 2008.[35]

To the extent the "Conclusions of Law" contain any items which should more appropriately be considered "Findings of Fact," such items are incorporated herein by this reference.

### Burden of Proof

■ Miller seeks to recharacterize the monies advanced by Dow and Cox to International as equity, and avoid the repayment of those sums in early 2007 as fraudulent transfers under state law.[36] Under Oklahoma's version of the Uniform Fraudulent Transfer Act (the "UFTA"),[37] the burden of proof is on the creditor to prove the elements of a fraudulent transfer.[38] Oklahoma law is silent regarding the standard of proof required.[39] When federal courts interpret a state statute as a matter of first impression, they are required to predict how the state's highest court would interpret it, and then abide by that prediction.[40] Oklahoma courts are directed to interpret the UFTA in a manner that makes it uniform among states that

---

**32.** *Plaintiff's Exh. 56.*

**33.** These two amounts total $1,455,513.40. A reason for the difference between this amount and the $1,524,653.07 figure contained in Plaintiffs Exhibit 56 was not presented at trial.

**34.** *Case No. 08–80228, Docket No. 58.*

**35.** *Case No. 08–80228, Docket No. 136.*

**36.** *See* § 548 and § 544(b).

**37.** Okla. Stat. Ann. tit. 24, §§ 112–123 (West 2008 and Supp.2010).

**38.** *See Eck v. USA Prop. Co. (In re Dodd),* 97 B.R. 74, 75 (Bankr.N.D.Okla.1989).

**39.** *Id.*

**40.** *Johnson v. Riddle,* 305 F.3d 1107, 1118–19 (10th Cir.2002).

have enacted it.[41] Many states have determined that the proper standard of proof under the UFTA is the preponderance of evidence standard.[42] This Court presumes that the Oklahoma Supreme Court, if asked, would do the same, and will apply the preponderance of the evidence standard in this case.

### Conclusions of Law[43]

■ In order to decide this case, the Court must resolve two central issues. Initially, the Court must determine whether the monies placed into International by Dow and Cox should be characterized as debt or equity.[44] The Court must then decide whether the repayment of those sums from proceeds of the sale of the Rig may be set aside as a fraudulent transfer under Oklahoma law.

### Debt vs. Equity

■ The United States Court of Appeals for the Tenth Circuit has adopted a list of factors to be considered in order "to distinguish true debt from camouflaged equity":

(1) the names given to the certificates evidencing the indebtedness;

(2) the presence or absence of a fixed maturity date;

(3) the source of payments;

(4) the right to enforce payment of principal and interest;

(5) participation in management flowing as a result;

(6) the status of the contribution in relation to regular corporate creditors;

(7) the intent of the parties;

(8) "thin" or adequate capitalization;

(9) identity of interest between the creditor and stockholder;

(10) source of interest payments;

(11) the ability of the corporation to obtain loans from outside lending institutions;

(12) the extent to which the advance was used to acquire capital assets; and

(13) the failure of the debtor to repay on the due date or to seek a postponement.[45]

"None of these factors is dispositive and their significance may vary depending upon circumstances."[46] The analysis is to be done on a case-by-case basis, with varying weight given to the factors based upon the circumstances of the particular case. "No mechanistic scorecard suffices. And none should, for Kabuki outcomes elude difficult fact patterns."[47]

### Names

When Dow and Cox entered into their initial transactions with International, the documents evidencing the transactions

---

41. *See* Okla. Stat. Ann. tit. 24, § 123 (West 2008).

42. *See, e.g., Prairie Lakes Health Care Sys., Inc. v. Wookey,* 583 N.W.2d 405, 411 (S.D. 1998) and *Morris v. Nance,* 132 Or.App. 216, 888 P.2d 571, 576 (1994).

43. The shortest distance between two points is a straight line. The parties have advanced various and sundry legal theories in support of their positions. The Court will consider only those necessary to reach its conclusion.

44. It is well established that bankruptcy courts have the power to consider such a

recharacterization. *See In re Official Comm. of Unsecured for Dornier Aviation, Inc.,* 453 F.3d 225, 233 (and cases collected therein) (4th Cir.2006).

45. *In re Hedged–Investments Assocs., Inc.,* 380 F.3d 1292, 1298 (10th Cir.2004) (citation omitted) (hereafter *"Hedged–Investments "*).

46. Hat 1298–99.

47. *In re SubMicron Sys. Corp.,* 432 F.3d 448, 456 (3rd Cir.2006).

were called "Promissory Notes." The Court gives this factor little, if any, weight. It is not at all clear from the record when the Dow Note and/or the Cox Note were actually created. Although the Dow Note is dated as of October 29, 2004, Dow could not remember when he first saw said note, and he did not execute the related "U.S. Share Private Placement Subscription and Loan Agreement" until January of 2006.[48] Cox also had no recollection as to when he received the Cox Note. Dow and Cox both testified that they gave little thought to the manner in which their investment was documented, and neither sought the advice of counsel in this regard. From the perspective of International and Oak Hills, the focus was upon raising capital and securing "partners" in the business.[49] The Court sees very little in a name; after all, the issue is whether the transaction should be recharacterized.

*Source of Payments*

■ Citing Eleventh Circuit authority, Miller contends that "[i]n order for an advance of funds to be considered a debt rather than equity, the courts have stressed that a reasonable expectation of repayment must exist which does not depend solely on the success of the borrower's business."[50] The Court believes this factor must be considered in conjunction with a borrower's overall capital structure. The question is whether the lender has any reasonable expectation of payment if the business fails. It is one thing to loan money on an unsecured basis to a debtor with a significant net worth or positive equity. Even if a default occurs, there is a reasonable expectation of repayment out of something other than earnings. On the other hand, if the capital structure of the entity is such that future profits are the only hope of repayment, and a lender knows or should know that, the transaction sounds in equity.

The evidence before the Court establishes that Dow and Cox were to receive their return on investment through profits generated by International and Oak Hills from the rental of the Rig. There appears to have been no other potential source for repayment, unless one considers the source actually used: proceeds from the sale of the Rig. Sale of the Rig was not part of the business model of International and Oak Hills. Under the business model, Dow and Cox were to be repaid with business profits. This is indicative of an equity investment.

*Identity of Interest Between Creditor and Stockholder*

■ "If stockholders make advances in proportion to their respective stock ownership, an equity contribution is indicated. On the other hand, a sharply disproportionate ratio between a stockholder's percentage interest in stock and debt is indicative of bona fide debt."[51] Moreover, at least one court has held that

> Where there is an exact correlation between the ownership interest of the equity holders and their proportionate share of the alleged loan, this Court believes this evidence standing alone is almost so overwhelming that the advance was in fact a capital contribution to equity and not a loan that coupling

**48.** *Transcript of Proceedings held Sept. 28, 2009, Docket No. 84,* page 30, line 3 through page 38, line 22.

**49.** *Plaintiff's Exh 7–02.*

**50.** *In re Lane,* 742 F.2d 1311, 1314 (11th Cir.1984) (citation omitted). *See also Stin-*

*nett's Pontiac Serv., Inc. v. Comm'r. of Internal Rev.,* 730 F.2d 634, 638–39 (11th Cir.1984).

**51.** *In re AutoStyle Plastics, Inc.,* 269 F.3d 726, 751 (6th Cir.2001) (quoting *Roth Steel Tube Co. v. Comm'r of Internal Rev.,* 800 F.2d 625, 630 (6th Cir.1986)).

this with the complete lack of formality evidenced by the records of the transaction this Court is convinced that holding the advances to be equity is correct.[52] The Investment Package provided that Dow and Cox would each receive a 25% interest in International in exchange for cash contributions of $500,000. Other investors were to provide cash, property, and/or expertise. Under the concept outlined in the Investment Package, four investors were to provide roughly equal value (in the form of assets, cash, and/or expertise) in exchange for equal ownership interests in International. Such a structure is indicative of equity. In a manner roughly consistent with this structure, and thus consistent with an equity transaction, Dow and Cox provided their $500,000 and received their 25% ownership interest.[53]

### Enforcement of Payment of Principal and Interest

■ Dow and Cox argue that their notes each contained firm due dates of two years from their effective date, indicating that the notes should be considered debt. The case is not nearly as strong as Dow and Cox would make it. The two year period was in effect the "start-up" period for International and Oak Hills. During that period, Dow and Cox had no right to payment of either principal or interest. The same was true of the "new" notes that were part of the 2006 Oak Hills Documents. A delay in payment requirement until after a business is profitable is indicative of an equity investment.[54]

### Participation in Management

Neither Dow nor Cox participated in the management of International, Oak Hills, Resources, or Lexington. There is nothing in the record that persuades the Court they were given the opportunity to do so. The Court does not accept Miller's argument that the ownership of stock by Dow and Cox placed them in a position to manage any of these corporate entities.

### Intent of the Parties

When it comes to considering the intent of the parties, the Court's task becomes difficult. At the time of an initial investment, investors hope to make money. Lots of it. By the time the business has entered into a downward spiral, the parties are in survival mode. Testimony offered in court is shaped by the passage of time and the change in expectations. Recollection is jaundiced by a desire to minimize losses. For this reason, courts look to the "objectively indicated intent" of the parties rather than the subjective recollections testified to at trial.[55] "A court must look not simply at self-serving declarations of the parties, but instead must examine those circumstances surrounding the transaction." [56]

Dow and Cox testified they believed their investments to be in the form of a loan and that they would not have placed their money in International had they known it might be treated as equity. Such testimony serves them well at trial as they attempt to retain the monies paid to them.

---

52. *In re Cold Harbor Assocs., L.P.,* 204 B.R. 904, 919 (Bankr.E.D.Va.1997), cited with approval by *In re AutoStyle Plastics, Inc.,* 269 F.3d at 751.

53. As it reaches this conclusion, the Court is aware of the alleged subsequent assignment between Cox and Newport. Such an assignment does not change the nature of Cox's initial investment in International.

54. *In re Official Comm. of Unsecured for Dornier Aviation, Inc.,* 453 F.3d 225, 234 (4th Cir.2006).

55. *In re Lane,* 742 F.2d at 1316.

56. *Id.* (citing *Tyler v. Tomlinson,* 414 F.2d 844, 850 (5th Cir.1969)).

There is much more to be learned from the conduct of Dow and Cox at the time they provided money to International. At that time, they did not bother with corporate formalities. Neither could state with any certainty when they first reviewed their respective promissory note, or if they had ever seen the note prior to litigation. Neither obtained the assistance of counsel prior to transferring money to International. In some cases, money was transferred to International days or weeks before the effective date of the note. When the debt instruments were rewritten in early 2006, neither Dow nor Cox insisted that the amounts be recalculated to include accrued but unpaid interest, nor could they give any reason that they would have granted a concession to waive such interest. One who believes that an investment is a bona-fide debt does not act in such a fashion.

We can gain some degree of insight into the intent of International and Oak Hills by looking at the "Investment Package." International and Oak Hills were seeking the infusion of capital in order to purchase capital assets; namely, the Rig. According to the Investment Package, the characterization of the investments as debt was done in order to minimize the tax consequences of receiving a return on investment.[57] If these are treated transactions as true debts, both Dow and Cox obtained a significant ownership interest in International at a *de minimis* cost. The amount they paid for the stock (which, despite ambiguities in the record, the Court presumes to be $2,500.00) was negligible. If the transactions were to stand as originally created, Dow and Cox, for all practical purposes, obtained something for nothing.

*Inadequate or "Thin" Capitalization*

Miller claims the debt to equity ratio of International at its inception was approximately 137 to 1. Dow and Cox do not take issue with the calculation, but instead claim that undercapitalization is not in and of itself a cardinal sin. They contend any undercapitalization of International is no cause for concern, given the rosy financial projections contained in the Investment Package and the history of International and Oak Hills after 2004. While the Court agrees that undercapitalization is not determinative of whether recharacterization is appropriate, the Court believes it is a factor to be considered. The Court is also not convinced that the use of a ratio is the proper method of determining whether an entity is undercapitalized.

Dow and Cox rely upon a decision of the United States Court of Appeals for the Seventh Circuit, *In re Lifschultz Fast Freight*,[58] in support of the argument that undercapitalization is not a significant factor in the recharacterization of debt. Although factually inapposite,[59] *Lifschultz* provides guidance on how to determine whether a corporation was undercapitalized at a particular point in time. The Court in *Lifschultz* did not totally discount undercapitalization as a factor in its determination of whether an insider's claim should be equitably subordinated; instead, the court held that undercapitalization

---

57. This Court offers no opinion on the viability of such a structure for purposes of federal or state income tax purposes.

58. 132 F.3d 339 (7th Cir.1997) (hereafter *"Lifschultz"*).

59. *Lifschultz* is a case that concerns equitable subordination under § 510 of the Bankruptcy Code. The doctrine of equitable subordination allows a bankruptcy court to change the priority between claims if certain factors are present. In this case, Dow and Cox have no claim against the consolidated bankruptcy estates, as they were paid in full prior to the filing of the bankruptcy cases of Lexington and Oak Hills. Therefore, the doctrine of equitable subordination is inapplicable.

alone, without more, was not sufficient to support equitable subordination of the claim.[60] In a case involving both the recharacterization and equitable subordination of a claim, our court of appeals in *Hedged–Investments* adopted the holding of *Lifschultz*,[61] and also expressly stated that "thin" or inadequate capitalization was a factor to be considered in the recharacterization analysis.[62]

The *Lifschultz* court rejected the notion that "absolute measures of capital inadequacy" such as debt to equity ratios were a proper method to determine whether a business was undercapitalized.

> Instead a rule of reason governs. A firm is adequately capitalized for purposes of equitable subordination if its equity capital equals or exceeds "what reasonably prudent men with a general background knowledge of the particular type of business and its hazards would determine was reasonable capitalization in the light of any special circumstances which existed at the time of incorporation of the now defunct enterprise." To put this rule of reason into practical form, the approach finding the most favor is the two-pronged test enunciated in *Mobile Steel*. This test takes its cue from observable, formal changes in the firm's capital structure. The first prong looks to the moment of initial capitalization of the firm. *Undercapitalization exists at inception "if. in the opinion of a skilled financial analyst, [the capitalization] would definitely be insufficient to support a business of the size and nature of the [debtor] in light of the circumstances existing at the*

*time the bankrupt was capitalized."* The second prong looks to the time of the insider's loan, which may or may not be after inception. *Undercapitalization at the time of the loan exists if the debtor "could not have borrowed a similar amount of money from an informed outside source."* If the debtor could have raised the funds elsewhere on similar or better terms, the inference would be that a third party thought that the firm had enough equity capital and was, in light of that fact and others, creditworthy. One can therefore safely conclude that such a firm is not undercapitalized. If the firm could not have borrowed elsewhere, however, the firm was undercapitalized at the time of the insider's loan.

> \* \* \*

*If the founders set up a clearly undercapitalized firm from the start, a court may with confidence find undercapitalization without risk of Monday morning quarterbacking.*[63]

In our case, Dow and Cox made their investments in International at the time of its inception. Thus, unlike the facts in *Lifschultz*, we are looking at the capitalization of International at its creation.

Thomas Potts, the expert presented to the Court by Miller, testified that, based upon his review of the transactions, International could not have borrowed any funds from a traditional source at the time of its inception.[64] David Newsome, the expert presented by Dow and Cox, did not "have an opinion one way or another" on

---

**60.** *Lifschultz*, 132 F.3d at 345.

**61.** *Hedged–Investments*, 380 F.3d at 1302–03.

**62.** *Id.* at 1298.

**63.** *Lifschultz*, 132 F.3d at 351–52 (citations omitted) (emphasis added).

**64.** *Transcript of Proceedings held Sept. 30, 2009, Docket No. 86,* page 36, line 16 through ·page 37, line 1.

the issue.[65] The Court finds that, if the amounts advanced by Dow and Cox are treated as debt, International was thinly capitalized at the time of its inception. The Court further agrees with the reasoning in *Hedged–Investments* and *Lifschultz* that while thin or inadequate capitalization of a company may be indicative of an equity investment, it is not dispositive of the issue. With respect to the arguments advanced by Dow and Cox regarding the financial condition of the companies in January of 2006 when the transactions were restructured, those matters are discussed *infra.*

### Ability of the Corporations to Obtain Outside Lending

The Court finds that neither International nor Oak Hills had the ability to obtain loans from traditional sources in late 2004.

### The Extent to Which the Advance Was Used to Acquire Capital Assets

The monies advanced by Dow and Cox were used to acquire the Rig, the primary capital asset used in the business operations of Oak Hills and International.

### Interest Payments

■ The ordinary lender is concerned with the payment of interest. Interest represents the sole return on its investment. Equity, on the other hand, is concerned with profits. Return on equity is based upon the profitability of the enterprise. More concern with interest is indicative of debt. Less concern with interest is indicative of equity.

Dow and Cox had little concern with the calculation of interest due or its payment. No interest was to be paid under the terms of the Dow and Cox Notes for a period of two years. No interest was actually paid until the Rig was sold. When the transactions were restructured in January 2006, none of the interest that had supposedly accrued between October 2004 and January 2006 was included in the amount of the new notes. A lender concerned with repayment of interest would insure that his or her loan documentation accurately set forth the amount of interest accrued but unpaid. Such was not the case here, at least from a documentation standpoint.[66]

### Precision in the "Loan" Transaction

Although not listed as a factor in *Hedged–Investments,* this Court also believes that one can ascertain the intent of the parties by looking at the circumstances surrounding the creation of the "debt." By their nature, lenders are prudent. I's are dotted, t's are crossed, and money is advanced by a lender only *after* everything appears to be in order. There is a simple reason for this. Lending is, by its nature, a contractual arrangement. If the contract is not in order, not properly executed or, heaven forbid, unsigned, the lender at the end of the day may be left with little if anything to enforce. Mr. Potts, the expert presented by Miller, aptly described the attention to detail exhibited by Dow and Cox using a single word: "sloppiness."

The Court is struck by the lack of precision, attention to detail, and the failure to take any prudent action by Dow or Cox. Dow testified that he advanced money before the promissory note was signed and before he had even seen it. The record is unclear as to when the Dow Note or the Cox Note were actually signed; it is entirely possible that it was weeks or months after monies were advanced. Dow could

---

**65.** *Id.,* page 179, lines 4 through 9.

**66.** It does not appear that anyone involved in the transaction gave much deference to the notes executed in January of 2006, for when Dow and Cox were actually paid, interest was calculated from the dates of the Dow Note and the Cox Note.

not recollect when he actually saw a signed copy of the Dow Note. Cox's recollection on the issue was equally vague. When the notes were rewritten in 2006, they contained no provision for payment of the interest accrued during that interim period. Although Dow and Cox claim to have advanced well over one million dollars between them as part of this transaction, neither went so far as to review documents before money was advanced or consult with counsel regarding the same. These actions do not square with the actions of a prudent lender or anyone who is actually loaning money.

*Failure to Pay Timely or to Seek Postponement of Payment*

Dow and Cox were paid nothing prior to the sale of the Rig. They argue that this means nothing, as the Dow Note and Cox Note were renegotiated prior to their due date as part of the 2006 Oak Hills Documents. The effect of this was to postpone the date of repayment of the monies owed to Dow and Cox (assuming the same are in fact bona fide loans) for an additional two years. In effect, International, Oak Hills, and Resources deferred repayment of the amounts claimed by Dow and Cox until one of two events occurred: (1) the business became profitable enough to allow for repayment; or (2) the business failed and monies were repaid as a part of a liquidation. Either scenario would support recharacterization.[67]

*Debt vs. Equity: The Conclusion*

■ The Court concludes that the Dow Note and the Cox Note should be recharacterized as equity contributions. When viewed as a whole, the transaction is an attempt to provide Dow and Cox all of the benefits of equity ownership without any of the attendant risks. Dow and Cox each obtained a one-quarter ownership interest in International and all of its upside while preserving their investment in the event of a business failure. Such a characterization is of little concern to anyone unless and until the business fails. If countenanced, the effect of this transaction will be to elevate the claims of Dow and Cox over those of all general unsecured creditors. The concept of owning equity in a corporation does not allow such a result, and the concept of equity in jurisprudence requires the same conclusion.

### The Effect of the 2006 Restructuring

■ Dow and Cox argue that the Court should focus its attention on the fact that, under the terms of the 2006 Oak Hills Documents, they obtained a direct secured interest in the Rig, the proceeds of which were ultimately used to satisfy their claims.[68] Miller argues that once the Dow Note and the Cox Note are properly recharacterized as equity, the transaction

---

67. *See Ellinger v. United States,* 2004 WL 2110696 at *6 (M.D.Fla. June 23, 2004) ("When a party seeks a return on his advances only when it would be in the best interest of the corporation, the advances are placed 'at risk of the business.' ... Seeking a return on advances only when the corporation achieved a level of success does not fit within the definition of a debt relationship.") (internal citation omitted).

68. In their Post–Trial Brief, counsel for Dow and Cox states that "Dow and Cox believe that the January 23,2006 transaction was really a novation in which a new agreement was reached which superceded and replaced the original agreement." *Dow and Cost [sic] Post Trial Brief, Docket No. 98,* at 14. The argument is not well taken. The issue of novation was not raised by Dow or Cox in their answer to the complaint filed herein, nor mentioned in the Pre–Trial Order. There is nothing in the testimony of either Dow or Cox that would support a finding that they understood the concept of a novation, much less that they intended such a concept to apply to the 2006 Oak Hills Documents.

represented by the 2006 Oak Hills Documents is nothing more than a fraudulent transfer.

Under the UFTA,

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

1. with actual intent to hinder, delay, or defraud any creditor of the debtor; or

2. without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

 a. was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction, or

 b. intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.[69]

The UFTA provides a list of factors to be considered in determining whether actual fraudulent intent is present:

In determining actual intent pursuant to the provisions of paragraph 1 of subsection A of this section, consideration may be given, among other factors, to whether:

 1. the transfer or obligation was to an insider;

 2. the debtor retained possession or control of the property transferred after the transfer;

 3. the transfer or obligation was disclosed or concealed;

 4. before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

 5. the transfer was of substantially all the debtor's assets;

 6. the debtor absconded;

 7. the debtor removed or concealed assets;

 8. the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

 9. the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

 10. the transfer occurred shortly before or shortly after a substantial debt was incurred; and

 11. the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.[70]

The determination of whether fraudulent intent is present is a factual one done on a case-by-case basis.[71] When a plaintiff establishes the presence of sufficient badges of fraud, he or she "is entitled to a presumption of fraudulent intent. Thereafter, the burden shifts to the transferee to show some legitimate supervening purpose for the transfers." [72]

---

69. Okla. Stat. Ann. tit. 24, § 116A.

70. Okla. Stat. Ann. tit. 24, § 116B.

71. *McCain Foods USA, Inc. v. Cent. Processors, Inc.*, 275 Kan. 1, 61 P.3d 68, 77 (2002) (citing Uniform Fraudulent Transfer Act § 4, Comment (6), 7A U.L.A. Part II 303 (1999)).

72. *In re Honey Creek Entm't, Inc.*, 246 B.R. 671, 685 (Bankr.E.D.Okla.2000) (citation omitted) (hereafter *"Honey Creek "*), rev'd on other grounds by 37 Fed.Appx. 442

An examination of the transactions set out in the 2006 Oak Hills Documents reveals several badges of fraud. Oak Hills continued in possession and control of the property after the encumbrances were granted. The liens created pursuant to the 2006 Oak Hills Documents encumbered all of Oak Hills' assets. Oak Hills received no new consideration in exchange for the encumbrance. Shortly after the effective date of the 2006 Oak Hills Documents, Oak Hills began incurring large unsecured debt as it undertook its shale drilling efforts in Texas.[73] Humphreys testified that Oak Hills began incurring large unsecured debt almost immediately in 2006.

In addition, the Court finds that the encumbrance of Oak Hills' assets was concealed. There is nothing to indicate that any of the 2006 Oak Hills Documents were made public. Of particular importance is the fact that the liens created pursuant to the 2006 Oak Hills Documents were not perfected. Perfection would have required the filing of a financing statement (ostensibly with the Oklahoma Secretary of State) and would have made the transaction a matter of public record. Miller has carried his burden. The presumption of fraud exists with respect to the liens created by the 2006 Oak Hills Documents.

In response, Dow and Cox argue that the 2006 Oak Hills Documents represent an attempt to "clean up" their initial transaction. They argue that "reasonably equivalent value" was given in that the obligations owed by International under the Dow Note and the Cox Note were cancelled in exchange for the new secured notes created as part of the 2006 Oak Hills Documents. The argument is not persuasive. The Court has concluded that the position of Dow and Cox in International should be recharacterized as equity. Any attempt to "clean up" the initial transaction between International and Dow and Cox is an attempt to convert equity into secured debt with no new consideration being paid. The surrender of unsecured debt and general equity in exchange for secured debt, without more, does not constitute "reasonably equivalent value" under any known standard. The "clean up" of Dow's and Cox's position is to the detriment of other creditors of Oak Hills, and does not constitute a "legitimate supervening purpose" that would validate the transfers contemplated in the 2006 Oak Hills Documents.

Dow and Cox also contend that, in any event, the Court should not be concerned with what transpired in early 2006 because the Oak Hills entities were solvent at the time of the 2006 Oak Hills Documents.[74] The argument misses the mark. For purposes of § 116A(1) of the UFTA, if an actual intent to defraud is found, "solvency is immaterial."[75] Even if Oak Hills were solvent as of the effective date of the 2006 Oak Hills Documents, the finding of a fraudulent transfer under § 116A(1) of the UFTA is unaffected.

The evidence establishes sufficient badges of fraud with respect to the 2006 Oak Hills Documents to create the presumption that the transfers to Dow and

---

**73.** The use of the phrase "effective date" has been carefully chosen. While all of the documents reflecting the various transactions between Dow and Cox and the various other entities (International, Oak Hills, Resources, and Newport Capital) are all given "effective dates," there is virtually nothing in the documents themselves (such as a notarization of signature) that can be used to verify when the documents were actually created or executed. Those dates remain a mystery.

**74.** *Dow and Cost [sic] Post Trial Brief, Docket No. 98,* at 14.

**75.** *Honey Creek,* 246 B.R. at 686.

Cox made pursuant to those documents are fraudulent transfers under § 116A(1) of the UFTA. Dow and Cox have failed to rebut the presumption. The Court concludes that the transfer of a security interest in the assets of Oak Hills to Dow and Cox made under the terms of the 2006 Oak Hills Documents are fraudulent transfers and may be set aside.

### Payment to Dow and Cox from the Proceeds of the Sale of the Rig

 Under § 117A of the UFTA,

> [A] transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.[76]

The UFTA defines insolvency in the balance sheet sense: if the debtor's liabilities are greater than its assets, the debtor is insolvent.[77] The UFTA creates a presumption of insolvency when a debtor "is not generally paying his debts as they become due[.]" [78]

The Rig was sold in January of 2007 for $3.1 million. At the time of sale, Oak Hills had incurred millions of dollars in unsecured debt that it had not paid and could not pay. On that basis, a presumption of insolvency arises under the UFTA. Dow and Cox offered no evidence to rebut the presumption. Instead, Dow and Cox argue that the only evidence before the Court established that the combined operations of Resources and Oak Hills were insolvent in 2007, and that such evidence is insufficient to establish that Oak Hills, standing alone, was insolvent. Again, the argument misses the mark. It is undisputed that during 2006 and prior to January 5, 2007, Oak Hills was not paying its debts as they came due. As a matter of law, there is a presumption of insolvency that Dow and Cox have done nothing to rebut. Moreover, the Rig represented the primary, if not the sole, asset of Oak Hills. Oak Hills had more than $5 million in unsecured debt at the time of the transfers to Dow and Cox. There is no dispute that the proceeds from the sale of the Rig represented all of the assets of Oak Hills converted to liquid form. There is also no dispute that, after those proceeds were distributed, there were millions of dollars of unpaid unsecured claims. Were that not the case, this litigation would not exist. The Court has little difficulty finding that Oak Hills was insolvent in January of 2007.

 In exchange for payment of proceeds from the sale of the Rig, Dow and Cox provided Oak Hills with nothing. There was no debt to satisfy, for the alleged debt was nothing more than equity. The payments to Dow and Cox may be avoided as constructively fraudulent transfers under § 116A(1) of the UFTA.

### Remedies

 Under § 550(a) of the Bankruptcy Code, when a fraudulent transfer is avoided, "the trustee may recover, for the benefit of the estate, the property transferred or, if the court so orders, the value of the property[.]" [79] Here, what was transferred was cash. Accordingly, the appropriate remedy is a judgment for the amount of cash fraudulently transferred.

---

**76.** Okla. Stat. Ann. tit. 24, § 117A.

**77.** Okla. Stat. Ann. tit. 24, § 114A.

**78.** Okla. Stat. Ann. tit. 24, § 114B.

**79.** § 550(a).

 Miller also seeks punitive damages and attorneys' fees.[80] In effect, Miller seeks his attorneys' fees as the prevailing party in this adversary proceeding. With respect to the issue of awarding attorneys' fees:

The award of attorneys' fees to a prevailing party runs contrary to established principle. As another bankruptcy court has noted:

[I]n absence of any statutory authority to award attorneys' fees, the Court will adhere to the "American Rule," which provides that in cases that are based upon or involve federal law, attorneys' fees are not allowable absent a statutory basis or enforceable contract between the parties.

*In re Baker*, 205 B.R. 125, 135 (Bankr. N.D.Ill.1997) (citations omitted). The policy consideration underlying the American Rule

is that because "litigation is at best uncertain one should not be penalized for merely defending or prosecuting a lawsuit, and that the poor might be unjustly discouraged from instituting actions to vindicate their rights if the penalty for losing included the fees of their opponents' counsel."

*Towerridge, Inc. v. T.A.O., Inc.*, 111 F.3d 758, 765 (10th Cir.1997) (citations omitted). Under the American Rule, attorneys' fees are not considered as an element of damages which a party suffers as a result of litigation. This Court believes the American Rule is applicable to bankruptcy cases and will not shift fees between the parties as a matter of course.[81]

Miller cites to a variety of cases in support of his argument that the UFTA supports an award of attorneys' fees.[82] Interestingly, he cites to no cases arising out of the state of Oklahoma or any case arising out of any federal court in the Tenth Circuit. This Court believes that *Nichols* remains good law.

 Miller also seeks an award of punitive damages, relying upon state law.[83] A similar argument was rejected by the United States District Court for the Middle District of Tennessee:

The defendants argue that Hyundai cannot recover punitive damages for its Bankruptcy Code §§ 544 and 550 claims. (Docket No. 89 at 16.) In response, Hyundai argues that the relevant Tennessee and Alabama fraudulent transfer statutes allow punitive damages. (Docket No. 103 at 26–27.)

The plaintiff has asserted its fraudulent conveyance claims in pairs-one claim for avoidance under Bankruptcy Code § 544, and one claim for recovery of the value of the avoided transfer under § 550. Section 544(b) empowers a trustee to "avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a credi-

---

**80.** In the Pre–Trial Order, Miller requested a separate hearing on the issue of punitive damages and attorneys fees in the event he prevailed at trial. The Court has reviewed the record and determined that an additional hearing would be of no assistance.

**81.** *In re Nichols*, 221 B.R. 275, 278 (Bankr. N.D.Okla.1998) (hereafter *"Nichols"*).

**82.** *Plaintiff's Trial Brief, Docket No. 73*, at 35–36.

**83.** Miller cites to several cases as well as to Okla. Stat. Ann. tit. 24, § 9.1B. *See Plaintiff's Trial Brief, Docket No. 73*, at 35–36. The statutory citation is apparently incorrect, as 24 Okla. Stat. Ann. § 9.IB does not exist. It may be that Miller intended to cite to 23 Okla. Stat. Ann. § 9.1B, which deals with awards of punitive damages by juries. The Court will not presume to guess as to what statute Miller intended to rely upon.

tor." 11 U.S.C.S. § 544(b)(1). Section 550 then allows a trustee, when "a transfer is avoided under section 544" to "recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property." *Id.* § 550(a). Hyundai asserts three sets of §§ 544 and 550 claims, based on Tennessee and Alabama fraudulent transfer statutes.

Hyundai cites state court cases interpreting the Tennessee and Alabama statutes in its attempt to show that it can recover punitive damages here. (Docket No. 103 at 26–27.) But none of the plaintiff's cases address the remedies available to a trustee under the relevant provisions of the Bankruptcy Code. *See Orlando Residence v. Nashville Lodging Co.,* No. 01–A–01–9606–CH–00256, 1996 WL 724915, *6, 1996 Tenn.App. LEXIS 818, at *16 (Tenn.Ct. App. Dec.18, 1996); *Johns v. A.T. Stephens Enters.,* 815 So.2d 511, 517–18 (Ala.2001). The plaintiff is not suing directly under the state statutes, but instead under §§ 544 and 550 in a derivative capacity.

Hyundai's exact argument was addressed by the bankruptcy court in *Sherman v. FSC Realty LLC (In re Brentwood Lexford Partners, LLC),* 292 B.R. 255 (Bankr.N.D.Tex.2003). "[Bankruptcy Code] Section 550 does not provide for the recovery of exemplary damages.... [T]he court cannot invoke state law remedies to circumvent or undermine the specific remedy legis-

lated by Congress for the avoidance of a fraudulent transfer," *Id.* at 275 (addressing a § 550 claim for a transfer avoided under § 544(b)). Accordingly, the court will dismiss Hyundai's prayer for punitive damages on Claims 3, 4, 5, 6, and 8.[84]

Miller's reliance upon state law is wholly misplaced. His remedies are limited to those provided for under § 550 of the Bankruptcy Code. They do not include an award of punitive damages.

■ Even if an award of punitive damages were allowable under § 550, Miller has failed to present facts that would justify such an award. He has presented no evidence of a conspiracy to defraud. There is no evidence that either Dow or Cox were involved in the management of International, Oak Hills, or Resources. There is no evidence that they were involved in the creation of the debt/equity structure of International that led to the execution of the Dow and Cox Notes. There is no evidence that they made demand for payment, or orchestrated any of the transactions that led to their payment.[85] The entire transaction is being set aside, and Dow and Cox are being ordered to repay the estate over $1.3 million between them. The Court believes such a remedy to be sufficient.

### Pre–Judgment Interest

■ The initial complaint filed by Miller contained a request, without citation to authority, for "pre- and post-judgment

---

**84.** *Hyundai Translead, Inc. v. Jackson Truck & Trailer Repair, Inc.,* 419 B.R. 749, 760 (M.D.Tenn.2009). *See also In re Brentwood Lexford Partners, LLC,* 292 B.R. 255, 275 (Bankr.N.D.Tex.2003).

**85.** It is interesting that Dow and Cox testified that they were totally ignorant of the series of events that led to payment of their claims in full until after all of the wheels that led to

their payment were placed in motion. Certainly one could be suspicious of both their apparent ignorance and the good fortune that led to their repayment. However, Miller presented no evidence to rebut their avowed lack of involvement in the transactions that led to repayment of the amounts they claimed. This Court does not believe that an award of punitive damages should be based upon suspicion.

interest." [86] Interest on judgments in federal actions is governed by 28 U.S.C. § 1961.[87] Courts have held that the award of pre-judgment interest on fraudulent transfer claims is permissible under this statute, and is a matter left to the discretion of the trial court.[88] Where pre-judgment interest is to be awarded "[i]n connection with bankruptcy preference actions or fraudulent conveyance actions, prejudgment interest accrues from the date of demand or, in the absence of demand, from the commencement of the action." [89]

In the present case, the Court finds that an award of pre-judgment interest is appropriate. The amounts paid to Dow and Cox are easily calculable and not in dispute, and Dow and Cox have had the benefit of the use of the monies for an extended period of time. Since there is nothing in the record to establish if and/or when Miller made a demand for the return of the monies, pre-judgment interest shall be calculated from the date of the commencement of this action (September 11, 2008), at the federal judgment rate in effect as of that date. Post-judgment interest shall accrue from the date of the judgment at the statutorily prescribed rate. Miller may file a motion to tax costs within

**86.** *Docket No. 1.* The issue of pre-judgment interest is not addressed in the Pretrial Order, nor was it addressed in any of the briefs submitted by Miller. In his pre-trial brief, Miller makes no mention of pre-judgment interest, limiting his discussion of remedies sought to a judgment for the value of the property transferred to Dow and Cox, plus punitive damages and attorney's fees. *Plaintiff's Trial Brief, Docket No. 73*, at 35–36. In his post-trial brief, Miller contends that he "fully briefed the law supporting his request for an award of interest, attorney fees, and punitive damages" in his pre-trial brief. *Plaintiff's Post–Trial Brief Docket No. 99*, at 30. Miller has left it to the Court to ferret out authority to support his argument that he is entitled to pre-judgment interest.

**87.** The statute provides as follows:
**1961. Interest**
(a) Interest shall be allowed on any money judgment in a civil case recovered in a district court. Execution therefor may be levied by the marshal, in any case where, by the law of the State in which such court is held, execution may be levied for interest on judgments recovered in the courts of the State. Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1–year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment. The Director of the Administrative Office of the United States Courts shall distribute notice of that rate and any changes in it to all Federal judges.

(b) Interest shall be computed daily to the date of payment except as provided in section 2516(b) of this title and section 1304(b) of title 31, and shall be compounded annually.
(c)(1) This section shall not apply in any judgment of any court with respect to any internal revenue tax case. Interest shall be allowed in such cases at the underpayment rate or overpayment rate (whichever is appropriate) established under section 6621 of the Internal Revenue Code of 1986.
(2) Except as otherwise provided in paragraph (1) of this subsection, interest shall be allowed on all final judgments against the United States in the United States Court of Appeals for the Federal circuit, at the rate provided in subsection (a) and as provided in subsection (b).
(3) Interest shall be allowed, computed, and paid on judgments of the United States Court of Federal Claims only as provided in paragraph (1) of this subsection or in any other provision of law.
(4) This section shall not be construed to affect the interest on any judgment of any court not specified in this section.
28 U.S.C. § 1961.

**88.** *In re Fink*, 217 B.R. 614, 623 (Bankr. C.D.Cal.1997); *In re Int'l Loan Network, Inc.*, 160 B.R. 1, 20 (Bankr.D.D.C.1993)

**89.** *In re Republic Fin. Corp.*, 75 B.R. 840, 846–47 (Bankr.N.D.Okla.1987); *In re Gillett*, 55 B.R. 675, 679–680 (Bankr.S.D.Fla.1985) (and cases collected therein).

fourteen days of the date of the judgment. Miller should only seek to tax costs that relate to his claims against Dow and Cox. Costs that relate to Miller's claim against Grant Atkins are not properly taxable against Dow and Cox.

### Conclusion

The investments made by Dow and Cox in International are recharacterized as equity. The transactions effectuated pursuant to the 2006 Oak Hills Documents and the payments received by Dow and Cox in January of 2007 are set aside as fraudulent transfers under the UFTA and § 544. Under § 550, Miller is entitled to a judgment against Dow in the amount of $597,120.25, plus pre-and post-judgment interest, and a judgment against Cox in the amount of $858,011.15, plus pre- and post-judgment interest. All claims against Atkins are dismissed with prejudice under the terms of the settlement between Miller and Atkins. Relevant costs are taxed to Dow and Cox.

A separate judgment in accordance with this Memorandum Opinion is entered concurrently herewith.